THE MAYOR AND CITY COUNCIL OF BALTIMORE *vs.* HENRY WHITE.—*June* 1845.

The tenant in fee of a lot binding on the basin of the city of *Baltimore,* leased the same for a term of years, reserving a right to distrain and re-enter; and granted his lessee "the exclusive right of extending, not exceeding, &c., into the water, any and every part of said lot which fronted the basin, provided he could obtain permission for that purpose, from the *Mayor &c. of Baltimore,* or the legislature of the *State.* The reversion of this lot was sold to *O.,* who recovered the leased premises by ejectment for non-payment of rent, and applied to the corporation of *B.* for liberty to extend the lot into the basin, according to the original lease, which was granted, and the extension made. HELD:

1st. That the right to make the improvement, and it, when made, did not remain in the heirs of first tenant in fee, who leased it.

2nd. By the sale of the reversion to *O.,* all the right of the original tenant in fee, both in the lot, and the permission to extend the same, as granted by the lease, vested in *O.*

3rd. By the forfeiture of the lease, consequent upon the recovery in eject-ment, no right reverted to the first tenant.

4th. That if the lessee had made the improvement under the permission granted by his lease, the lessors and his assigns could have distrained or re-entered upon it, as upon the original lot.

The permission granted by the *Mayor and City Council of Baltimore,* to extend an improvement into the water, to an owner of a lot adjacent thereto, is not within our registration system.

That system sanctions no conveyance of, or incumbrance upon real property, created by matter in *pais,* or resting in parol.

The means by which a wharf is erected, under the act of 1745, in the city of *Baltimore,* and appropriated to the public use, form a part of the paper title, the record evidence, which must be resorted to, and examined, to trace the right to such property; no patent issues, but the title must conform to the acts of 1745, ch. 9 ; 1783, ch. 24 ; 1796, ch. 68 ; and the ordinances of that city.

The law imputes to a purchaser knowledge of all facts, appearing at the time of his purchase upon the paper or record evidence of title, which it was necessary for him to inspect to ascertain its sufficiency.

So the purchaser of a wharf in the city of *Baltimore,* erected under the authority of the acts of 1745, 1783, and 1796, though *bona fide,* is affected with notice of the permission granted to build it, and bound by it.

Where an ordinance was passed, granting permission to build a wharf, which required the written assent of the applicant for such permission, and it appeared that he erected the wharf, the law will presume such written assent, and the grantor, and his subsequent assignees, will be estopped from denying such assent.

Under the acts of 1783 and 1796, *the Mayor and City Council of Baltimore* may refuse their assent to the erection of a wharf, or may grant it with such conditions, limitations and restrictions, as they may deem most beneficial to the navigation, and use of the port, of that city.

Such a grant upon condition, that its exterior margin shall constitute a public wharf, is valid. Its dedication to the public use, when erected, may be required.

The collection of wharfage upon a public wharf, is a fit subject for State legislation.

The act of 1827, ch. 162, sec. 4, gives *the M. and C. C. of Baltimore*, the right to charge and collect wharfage from public wharves, and where the owner of a lot adjacent to such a wharf, demands and receives the wharfage, the city may recover the amount unlawfully received, and withheld from them, by such owner.

APPEAL from *Baltimore* County Court.

This was an action of *assumpsit*, commenced on the 1st September 1840, for money had and received, by the appellee, for the use of the appellants. The defendant pleaded the general issue.

Before the jury was sworn, the parties agreed, that the action was brought for the purpose of trying the following questions.

1st. Whether the wharf in the city of *Baltimore*, known by the name of *Oliver's* wharf, or any, and if any, what part of it is a public wharf?

2nd. Whether, if it shall be decided, that the said wharf, or any part of it is public, the defendant has acquired any such right to the part so decided to be a public wharf, as to debar the plaintiffs from charging and collecting to their use, such rate of wharfage as they may think reasonable, of and from all vessels, resorting to or lying at, landing, depositing or transporting goods or articles, other than the productions of this State, at or on the part of said wharf, so decided to be public? And for the purpose of fully and fairly trying and deciding the said questions, it is mutually agreed, that the defendant shall admit the receipt of a sufficient sum of money, previous to the institution of this action, as wharfage, to which the plaintiffs would be entitled, if entitled to recover by the decision of the questions above stated, as will sustain the jurisdiction of the court. It is further agreed, that each party shall

be entitled, on the trial of the case, to give in evidence all such documents and testimony, as would be proper and competent to use in any other form of action at law, or in equity, that could be instituted and tried, in regard to the just and full decisions of the questions above stated, or either of them. It is also agreed, that printed copies of all acts of Assembly, and ordinances of the city, shall be read in evidence by each party, and that plats, maps, and copies of documents, deemed to be correct by the counsel on each side, shall be admitted in evidence, without incurring the expense of special surveys or authentication, and that all errors in the form of action, and in the pleadings, shall be released by each party.

The plaintiffs to support the issue on their part joined, offered in evidence to the jury, that:

*Thomas McEldery* of *Baltimore* county, deceased, was seized and possessed in fee of the tracts of land, called "*Cole's Harbor* and *Todd's Range*." That he died so seized and possessed. That on the 29th day of July 1813, *Elizabeth McEldery, John McEldery* and *Thomas McEldery*, under authority of an act of Assembly of *Maryland*, passed at November session 1810, chap. 138, duly executed and acknowledged, and recorded an indenture of lease to *Martin F. Mayer*, for all that lot of ground, situate in the city aforesaid, and contained within, &c., beginning for the same on the west side of *Union Dock*, at the distance of 720 feet southerly, from the point or place, where the west side of said dock would be intersected by the south side of *Wilkes street*, if extended; and running thence southerly, bounding on the west side of said dock 425 feet; thence south forty-seven degrees west, still bounding on the water 36 feet; thence north forty-eight degrees west, still bounding on the water 205 feet, 2 inches; thence north three degrees west, still bounding on the water 305 feet; and thence by a straight line to the place of beginning, together with all, &c. To have and to hold the said lot and premises, with the appurtenances, together with the exclusive right of extending, not exceeding one hundred and four feet into the water, any and every part of the said lot, piece or parcel of ground,

which fronts the *Basin*, provided he can obtain permission for that purpose, from the city council of *Baltimore*, or from the legislature of the State of *Maryland*, unto the said *Martin F. Maher*, his, &c., from, &c., for and during, and until the full end and term of ninety-nine years, from thence next ensuing, with the right in the lessors, to distrain, re-enter, &c.

Whereby, they conveyed to *Martin F. Maher*, for the term of ninety-nine years, renewable forever, with the rights and privileges in said lease recited, the premises therein described, being parts of said tracts of land, of which the said *Thomas McEldery* died seized, and possessed as aforesaid. That on the 29th day of the same year, the said *Martin F. Maher*, by indenture, assigned and transferred said demised premises to *Job Smith*.

That on 25th February 1817, *Horatio McEldery* exhibited his petition in the Court of Chancery, praying for the sale of the real estate of *Thomas McEldery*, or of so much thereof as was necessary for the payment of his debts; that upon said petition proceedings were duly had, and on the 14th July 1817, a sale of the interest of *Thomas*, in and to the premises described in the foregoing lease, was duly decreed by the Chancellor of *Maryland*, and *Thomas Phenix* was appointed trustee to make said sale; that the sale thereof, in pursuance of said decree, was made by said trustee to *Robert* and *John Oliver*, to whom a conveyance thereof was made by indenture, bearing date on the 1st April 1818.

That in 1820, *Robert* and *John Oliver*, re-entered upon said demised premises, for the non-payment of the rent accruing under said lease, and by an action of ejectment for the non-payment of rent under the statute of 4th *Geo.*, 2d, instituted in *Baltimore* county court, ejected *Job Smith* from their premises.

The plaintiffs further offered in evidence the following petition, which it was admitted was signed and presented by *Robert* and *John Oliver*, dated October 16th, 1821.

"To the honorable, the *Mayor and City Council of Baltimore:* The petition of *Robert Oliver* and *John Oliver*, sheweth, that they are rightful owners and proprietors of a parcel of ground

situated on the west side of *Union Dock*, in the city of *Balti-more*, and bounded, in part, by the water of the basin of *Baltimore*, which is shewn on the plot hereto annexed.   They further state, that under the conveyance to them of said ground, there was granted the exclusive right of extending, not exceeding one hundred and four feet into the water, any and every part of said parcel of ground which fronts the basin, provided permission for that purpose could be obtained from the corporation of *Baltimore*, or the legislature of this State. They conceive that the grant of such privilege, would not be an infringement of, nor would it interfere with private rights. Wherefore, they pray, that by an ordinance, or resolution of your honors, your petitioners may be permitted to extend their aforesaid ground from its present limits, to the dotted lines shewn on the plot aforesaid, from E to F, and from F to G, and they, as in duty bound, &c.

ROBERT and JOHN OLIVER.

*Baltimore,* October 6th, 1821."

And the ordinance thereon passed, approved 10th November 1821, chapter 103, also the following petition likewise: admitted to have been signed by the said *Robert* and *John Oliver,* dated 8th November 1821.

"To the *Mayor and City Council of Baltimore.* Gentlemen, having examined an ordinance, passed in pursuance of our petition, relative to the extension of our property, binding on, and at the termination of *Hugh street,* deem the conditions too hard, and therefore ask leave to contract the same within the line on the plat from E to G, and request that an ordinance may pass accordingly, all which is respectively prayed for, by gentlemen.       Your ob't. servants,

Signed,       ROBERT and JOHN OLIVER.

8th November 1821."

And the ordinance of 19th November 1821, chapter 101, (which ordinance, with all others,) and the proceedings of the *City Councils* relating to the case, it is agreed, may be read from the printed books and proceedings of the said *Mayor and City Council,* as far as the same may be deemed material by

either plaintiffs or defendant, as if the same had been incorporated with, and made part of this bill of exceptions.

The plaintiffs further proved, by *Jesse Hunt*, that he is register of the city of *Baltimore*, having the care and custody of the papers connected with the proceedings of the City Councils; that he had carefully searched said papers, and that he had not been able to find any papers relating to said ordinances subsequent to the date thereof; that there is no record existing of the proceedings of the commissioners or port wardens, relating thereto; and they proved, by *W. L. Marshall Esq.*, that he had carefully searched the papers of the port wardens' office, without being able to find any documents relating thereto. They then offered in evidence, by *Joseph Owens*, a competent witness, that he was one of the port wardens of the city of *Baltimore*, for the years 1821 and 1822; that he recollects the fact, that the grounds included within the lines of E, F, G, and the other lines embracing the parallelogram, described on the plat accompanying the petition of *Robert* and *John Oliver*, of the 16th of October 1821, were filled up in pursuance of the ordinance of the 19th of November 1821, by the authorities of the city of *Baltimore;* that they were engaged in said work during the period of about two years, and that the expense of said filling up, was paid by the city of *Baltimore*. They further proved, by said *Owens*, that he was present, in the office of the port wardens' of *Baltimore* in 1821, when the Mayor of the city presented to said port wardens, the letter of *Robert* and *John Oliver*, signifying their assent to the terms of the ordinance of the 19th of November 1821, and that soon thereafter, the work of filling up said ground was commenced by the city authorities; that said letter he supposed to have been filed, but, that he has no knowledge what has become of it. They further proved, by the said *Owens*, that after the passage of the said last mentioned ordinance, and when he, as port warden, was about to proceed to fill up said ground, he had an interview with *Robert Oliver*, upon private business of the said *Oliver*, in which the improvement of the property referred to, became the subject of conversation,

57 v. 2

when said *Oliver* told witness that he had assented to the terms of said ordinance, although he thought it hard, that he should be required to fill it up with fresh earth to the extent required, over the filling which was to be done by the city. They further offered evidence by *Samuel Boyd*, that he was likewise a port warden in 1821 and 1822; that he knows that the grounds of *Robert* and *John Oliver* were filled up by the city, in pursuance of the ordinance of 19th November 1821, but that he has no recollection of ever having seen a letter or other paper signifying the assent of said *Olivers* to the terms of said ordinance. They likewise offered evidence, by *Walter Frasier*, that he was a laborer in the mud machine belonging to the city of *Baltimore*, in the years 1821 and 1822; that he assisted in filling up the grounds of *Robert* and *John Oliver*, above described, and that *Mr. Oliver* was almost every day present whilst the work was in progress, and gave directions as to the manner in which it was to be done.

It was admitted, that the plat above referred to, and accompanying this bill of exceptions, justly locates and describes the premises purchased by *Robert* and *John Oliver* from *Thomas Phenix*, as before stated.

The plaintiffs further offered in evidence, by *Jesse Hunt*, the register of the city of *Baltimore*, that the city authorities collected wharfage upon the property in controversy, from 1826 to 1831 inclusive; and proved, by *McNeill*, that witness, in conjunction with *Taylor*, rented the wharf in controversy for several years before the year 1831, from *Sprigg*, who was the officer charged by the city authorities with the collection of wharfage and tonnage, and that he paid therefor, $10 per month; that by virtue of this renting, witness collected wharfage and otherwise used said property, without molestation or interruption from *Mr. Oliver* until 1831, when he was told by *Mr. Oliver* that he was entitled to said wharf, and desired witness to acknowledge himself the tenant of one *Boyer*, who held under *Oliver*, and that upon witness declining so to do, *Oliver* cut loose the scow of witness from said wharf, after which, witness rented from *Boyer*, and continued so to do till he gave up possession of the wharf.

The plaintiffs further offered in evidence, that *John Oliver* is dead; that *Robert Oliver* thereupon became entitled to his interest in said property; that *Robert Oliver* is dead, and that the defendant purchased said property from his representatives, duly authorised to sell the same, and now holds under said purchase. It was admitted, that the defendant has in hand $100, received by him as wharfage upon said property.

The plaintiffs further proved, by *George M. Gill, Esq.*, that the space of ground marked on the aforesaid plot, as a street thirty feet wide, *Hugh street*, was laid out as a street in the year 1820, by the commissioners appointed and authorised by law to divide the real estate of the said *Thomas McEldery* among his heirs, and that he, the said *Gill*, had become possessed of a portion of the lots fronting on said street, by intermarriage with one of the heirs of said *McEldery*, and had leased and sold said lots as binding upon said street; and had always considered said street as a public street, or highway, made such in virtue of said division, and had so particularly explained to those who leased or purchased said lots from him.

The defendant proved, by said *Gill*, and by others, that the ground, thus marked, had not been paved or lighted, or otherwise reduced under the police regulations, but has always been very much blocked up by lumber and other obstructions of various kinds; and that the occupiers of the lots binding upon it had, from the filling up of the said ground to the division of the said *McEldery's* estate above referred to, collected wharfage upon the portions of said street in front of their respective lots, and that since the said division, they have continued to do so.

The defendant also offered in evidence, that *Hugh's street* had never been condemned, or opened as a public street or highway; and also proved, by *John Dukehart*, that he was a city commissioner the same years as *Joseph Owens*, and had never seen, or heard of a letter from *Robert* and *John Oliver*, or either of them, in reference to the acceptance of said ordinance.

The defendant also proved, by one *Fenby*, that the parallelogram E, F, G, had not been kept in repair at the public expense, but that he was obliged, by the city, to pay the usual hire of the mud machine of the city for repairing the same. The said *Fenby* being, at the time said repairs were made, and hire claimed, the tenant under *Robert Oliver*, claiming as has been heretofore set out.

The defendants further gave in evidence the patent for the said property, and prayed the court to instruct the jury as follows:

1st. That if they find, from the evidence, that *McEldery*, the elder, was originally the owner of that part of the tract of land called *Cole's Harbor*, which was bounded by the waters of the basin, and being such owner, made by authority of law, all the ground upon the plat which is in evidence, which lies immediately contiguous to such part of said tract, and in front thereof, including that portion of said ground which was leased afterwards by said *McEldery* to *Martin F. Maher*, that then said *McEldery* was the owner, in fee simple, of all of said ground so made as aforesaid.

2nd. If the jury find the facts stated in the first prayer, and also find, that after said portion of said ground was leased to *Martin F. Maher*, and before the year 1821, *Robert* and *John Oliver* became, by due course of law, by title derived from said *McEldery*, the owners in fee of said portion of said ground, and that being such owners, they, by the permission of the *Mayor and City Council of Baltimore*, or their duly constituted agents for this purpose, extended the said portion of said ground further into the basin, as the same appears on the plats, that then the said *Olivers*, by virtue of said facts, became, as soon as said further improvement was made, owners in fee of the same.

3rd. If the jury find the facts stated in the two first prayers, and shall also find, that in the division which was made of that part of said ground on the plats, which was made as aforesaid, by said *McEldery*, amongst his heirs, and for the purpose of that division, the streets located on said plats, were laid out,

and called for in the said division, and in the conveyances made in pursuance thereof; and shall also find, that said streets, or the ground on which they are located, have in no other way been disposed of by the heirs or assigns of said *McEldery*, or condemned, or appropriated to the use of the plaintiffs; and if they shall further find, that such streets have never been actually opened or used by the public, but on the contrary, and especially, the one called in the evidence *Hugh's street*, have been always, from the time they were laid out as aforesaid, totally obstructed by the proprietors of the lots, bounding on the same, by fences or otherwise, so as to render a passage over the same impracticable; that the plaintiffs have no title in the said streets, or the ground covered by them, and cannot, because of any such title in said *Hugh's street*, derive any title to that portion of the said wharf improvement, made by the *Messrs. Olivers*, which is in controversy in this action.

4th. If the jury find the facts stated in the three preceding prayers, then the plaintiffs have failed to prove title in that part of said wharf which is in controversy in this suit, and are not entitled to recover.

The plaintiffs prayed the court to instruct the jury as follows:

That if they shall believe the facts set forth in the several prayers, submitted on the part of the defendant, and shall further find from the evidence in the cause, that the petition, dated 6th October 1821, and signed *Robert* and *John Oliver*, was so signed by said *Olivers*, on the day of the date thereof, and that afterwards, and before the passage of the ordinance, of the extra session of 1821, (and approved 9th November 1821,) the said petition was presented to the *Mayor and City Council of Baltimore;* and that afterwards, and on the basis of said petition, the said ordinance was passed, and made, and approved, and that the said *Robert Oliver*, and said *John Oliver*, had notice of the passage of said ordinance, and of all its terms, provisions and conditions; and shall further find, that after the passage of said ordinance, and after notice of the terms, provisions and conditions thereof, the said *Robert Oliver* and *John Oliver*, signed the other petition, and dated 8th November 1821, and

presented the same, so signed by them, to the *Mayor and City Council of Baltimore;* and shall further find, that after the receipt of said last mentioned petition, and on the basis thereof, the *Mayor and City Council of Baltimore,* passed the ordinance which has been given in evidence, and approved 10th Nov. 1821, and that the said *Robt. Oliver* and *Jno. Oliver* had notice thereof, and assented to the terms, provisions and conditions thereof, and of the said preceding ordinance, as modified or altered by said last mentioned ordinance; and shall also further find, that the ordinance, approved 19th Nov. 1841, was passed and made by the *Mayor and City Council of Baltimore,* and that said *Robert Oliver* and *John Oliver* had notice thereof, and of the terms, conditions and provisions of said ordinance, and assented to the same; and that afterwards, said *Robert Oliver* and said *John Oliver* made and constructed the extension of ground into the *basin,* in the manner and to the extent given in evidence in this cause, and that the said extension was made under the authority, and under the terms, conditions and provisions of said ordinances; and shall further find from the evidence in the cause, that sand was supplied and delivered agreeably to the terms and provisions of the said last mentioned ordinance, and that the sand was so accepted and received by the said *John Oliver* and *Robert Oliver,* or by their agents, with their knowledge and acquiescence; and shall further find, that after said extension was made and completed, the city authorities, with the knowledge and acquiescence of the said *Robert Oliver* and *John Oliver,* took possession of the wharf, (now claimed by the plaintiffs as a public wharf,) under the authority, and by force of the terms, conditions and provisions of said several ordinances, and so continued in possession thereof, from 1825 to 1831, without any claim on the part of said *Robert Oliver* and *John Oliver,* or either of them, and without any question or denial of the title of the said plaintiffs, to hold and possess the same as a public wharf, that then the plaintiffs, under and by virtue of said ordinances, and of the facts hereinbefore stated, became, and were entitled, by contract, to the use and possession of said wharf, as a public

wharf of the city of *Baltimore*, and that as against said *Robert* and *John Oliver*, the said plaintiffs, under and by virtue of its provisions, was lawfully entitled to claim and hold the same as a public wharf. If the jury shall find the facts stated in the foregoing prayer, and that the defendant derived title to the property, connected with the matter in controversy, under the heirs of *Robert* and *John Oliver*, and is in possession, and claiming the title thereto, under said *Olivers*; and shall further find, that said defendant has received from tenants, and others in possession of said wharves, $100 and upwards as wharfage, that then the plaintiffs are entitled to recover such sum so in the hands of the defendant.

And the court, (ARCHER, C. J., and MAGRUDER, A. J.,) granted the first and third prayers of the defendant so as aforesaid offered, and rejected the second and fourth prayers, substituting in lieu of said second and fourth prayers the instruction following:

If the jury find from the evidence, that *Martin F. Maher* never improved the grounds included in his lease, nor applied for leave to do so, and that *Robert* and *John Oliver*, in the year 1820, obtained a judgment in ejectment, as the grantee of the fee from the *McElderys*, and the jury should believe, that the *McElderys* were owners, in fee, of the lots fronting on the said improvement, and designated on the plot as line marked 104 feet, that then the plaintiffs cannot recover, because the lease to *Maher*, was merged by said recovery, by *Oliver*, as grantee of the fee, and that the covenant made to *Maher* by *McEldery*, in relation to said improvement, became thereby inoperative, and passed no rights to *Robert* and *John Oliver*; and that if the jury find the facts offered in evidence in the cause to be true, *McEldery's* heirs were the owners of the fee on said lots, fronting on the water as above designated.

The court also rejected the prayers offered by the plaintiffs, to which instruction, so given by the court, and each of them, and to their refusal to give the instructions prayed for by the plaintiffs, and each of them, the plaintiffs excepted, &c.

The verdict and judgment being against the plaintiffs, they prosecuted this appeal.

The cause was argued before DORSEY, CHAMBERS and MARTIN, J.

By PRESTMAN, NELSON and McMAHON for the appellants, and

By GLENN and REVERDY JOHNSON for the appellee.

DORSEY, J., delivered the opinion of this court.

In bar of the appellant's right to recover, in the action they have instituted, a great variety of objections have been interposed. .

First, it is insisted, that the right to make the improvement in question, and the improvement when made, remain in the heirs of *Thomas McEldery;* and that, therefore, the agreement of the *Olivers*, in regard to the public wharf, was wholly inoperative and void. This objection, we think, cannot be sustained. By the deed for the reversion to *Robert* and *John Oliver*, all the right, title, and interest of the heirs of *McEldery,* as well in the water lots demised to *Martin F. Maher*, as in the extension or improvement thereon, which the lessee was authorised to make, passed to said *Olivers*, who, by virtue of said conveyance, and their recovery in ejectment against the lessee, and those claiming under him, under the statute of 4 *George* 2, became seized, in fee, of all the right, title, and interest in the property held by the heirs of *McEldery*, prior to the lease to *Maher;* and, upon the forfeiture, or termination of the lease, no right or interest in the original lot demised, or the improvement or extension authorised to be made by the lessee, could revert to them. To sustain the argument, urged by the appellee, that no entry or distress could have been made by the lessors or their assigns, had the improvement been made by *Maher*, the lessee, no authority has been adduced, nor do we think any can be found; nor can we conceive a reason why, if the improvement had been the work of the lessee, the right of entry, or distress, by the lessors or their

assigns, upon the improvement, was not as indisputable, as it was upon the original water lot itself.

The next objection, relied on by the appellee, is, that to give validity to the creation of this public wharf, in the mode in which it has been attempted, would be in violation of the registration system of our State, in regard to interests in lands, and in direct opposition to the decision of this court, in the case of *Hayes and Richardson*, 1 *Gill & John.* 366. This objection cannot be maintained. To give efficiency to the arrangement, by which this public wharf has been provided for, is in perfect accordance with the doctrines established in the case of *Hayes and Richardson*, and with the general registry system of the State. It sanctions no conveyance, or incumbrance, created by matters in *pais*, or resting in parol; the means by which the wharf has been erected and appropriated to the public use form a part of the paper title, the record evidence, which must be resorted to and examined, to trace the title to the property in question. No patent for this improvement has issued, or will issue from the land office of the State. No title to it can be shewn, but by a reference to the acts of 1745, ch. 9, sec. 10; of 1783, ch. 24, sec. 9; of 1796, ch. 68, sec. 10; and the ordinances of the city of *Baltimore*, of November the 10th and 19th, of 1821; and these disclose every thing in relation to the wharf, as fully as if its construction and use had been provided for in a patent from the land office, or by deed duly executed, acknowledged, and recorded amongst the land records of *Baltimore* county.

The next objection, raised to the appellants recovery, is, that the appellee is a *bona fide* purchaser, without notice, and, therefore, even though the *Olivers* were bound by the arrangement as to the public wharf, yet, that it has no obligation as to him. For this objection, there is not the slightest foundation; the law imputing to a purchaser a knowledge of all facts, appearing, at the time of his purchase, upon the paper or record evidence of title, which it was necessary for him to inspect, to ascertain its sufficiency.

Another of the objections of the appellee is, that it would be a fraud upon him, to presume the writing by the *Olivers* of the letter assenting to the terms of the city ordinances, as required by the ordinance of the 19th of November 1821.   If presuming the writing of such a letter would be a fraud upon the appellee, it would be equally a fraud upon the *Olivers*.   Can such a presumption as against them, be termed a fraud?   Nay, would it not rather be regarded as a fraud on their part, after exercising rights and acquiring property which only could have resulted from such a letter, to deny that they had written it? They are both at law and in equity estopped from doing so ; and the estoppel applies with equal force against the appellee claiming under them.

The act of 1745, ch. 9, sec. 10, enacts, that "all improvements, of what kind soever, either wharves, houses, or other buildings, that have, or shall be made out of the water, or where it usually flows, shall (as an encouragement to such improvers,) be forever deemed the right, title, and inheritance of such improvers, their heirs, and assigns forever."   To prevent the evil consequences likely to flow from this latitudinarian enactment, a prominent object of the act of 1783, ch. 24, in appointing "wardens for the port of *Baltimore*," was to protect, as concerns its navigation, the interests of its citizens, and the public at large; as a means of enabling the port wardens to do this, by the 9th section of this act it is enacted, "that no person, or persons, shall make, alter, or extend a wharf or wharves, from and after the publication hereof, without laying before the said wardens a plan of his or their intended wharf or wharves, and without consent first obtained, under the seal of the board, to carry the same into effect."   Under this act it appears to be conceded in the argument, (as well it might be,) that the port wardens were competent to have authorised the extension or improvement asked for by the *Olivers*, upon condition, that it be constructed of particular materials ; that it be abutted by a wall of stone, instead of wood, and that it be of a specified height, prescribed by the wardens of the port of *Baltimore*, or the successors to their powers, the

*Mayor and City Council of Baltimore.* It is equally clear, that the *Mayor and City Council of Baltimore* might have refused their assent to the wharf extension, in the plan proposed, or have required that a dock should be left in the middle of the extension, for the mooring of vessels, or that rings or posts be attached to the wharf, so that vessels might make fast, or moor to it, whether lying out in the basin or by the side of the wharf. If the safe and convenient navigation of the port of *Baltimore*, by the public, made such requisitions necessary, (of which necessity, the *Mayor and City Council* were the judges,) they were warranted in exacting them.

Of the great advantage and convenience resulting to the interests of navigation, by the public wharf in question, nobody can doubt. And, as the case is now before us, we are bound to presume that the extension, as proposed by the *Olivers*, could not, in the judgment of the city authorities, have been granted, without detriment to navigation, unless the injuries resulting from it, were counteracted by the great facilities afforded to navigation by the surrender to its uses, of the exterior margin of the improvement in the shape of a public wharf. If the city authorities believed that the unconditional grant of the power of improvement, proposed by the *Olivers*, would be ruinous to the navigation of the port of *Baltimore;* but, that its effects would be wholly obviated by the facilities to navigation afforded by the wharf at the southern side of the improvement, being dedicated to the use of the navigating public, were they not authorised, nay, were they not bound to withhold their assent, unless such a dedication were made? or suppose the *Olivers'* original application had thus proffered the dedication, ought the corporate authorities, entertaining such opinions, to have withheld their assent? We think not.

This case is not at all changed by the fact, that the privilege sued for by the *Olivers* was not granted, but upon superadded terms and conditions imposed by the corporation. Their action upon this subject must receive the same interpretation as if the terms, ultimately agreed on, had been the first, and only

plan and proposition of the *Olivers*, and as such, had been unconditionally assented to.   Nor is the case varied by the fact, that the board of wardens of the port of *Baltimore*, had been abolished, and their powers vested in the corporate authorities of the city.   What has been done, must receive the determination that would be given to it, had the original plan or application from the *Olivers*, been to the wardens; and been that ultimately established by the city ordinances, and so unqualifiedly assented to by the board of wardens.

We do not concur with the counsel of the appellee, who regard this case as identical in principle, with the case of the Mayor, Aldermen and commonalty of the city of *New York*, against *Scott*, decided by the Supreme Court of *New York*, and reported in 1 *Caines*, 543.   In the latter case, the act of the legislature required the owners of lots to fill them up, and make piers according to the directions of the corporation.   On non-compliance, the corporation were to be at liberty so to do, and to receive the wharfage to their own use.   The corporation passed an ordinance requiring the owners of lots, within a time specified to fill them up and make the piers, (which was accordingly done,) and reserving a portion of the wharfage on the piers, and declaring the piers, public streets, or highways, to be kept in repair by the said owners, their heirs and assigns. For such a reservation and declaration, not a semblance of authority was shewn ; and the court decided, that such a reservation was void, being wholly unauthorised by the act of the legislature, and it is difficult to imagine, how a doubt could have arisen in such a case.

In the case before us, the ordinances of the corporation do not, peremptorily, legislate away the water rights of the *Olivers*, without color of authority, and in manifest contravention of the act of the legislature, under which the ordinances were passed, as was done to the lot owners, by the Mayor, Aldermen, and commonalty of the city of *New York*, in the case reported in 1 *Caines;* but simply refuse an unconditional assent (which as a faithful statutory guardian of the navigation of the port of *Baltimore*, the corporation was bound to with-

hold,) to an improvement that could only be made, consistently with the paramount interests of navigation, upon the terms prescribed by the ordinances. They, the *Olivers*, were deprived of no right which they possessed; they were imperatively enjoined to do nothing; their actions were the result of their own discretion. They were offered powers of great value and importance, limited by no restriction, but that necessarily imposed by a just regard to the rights and interests of the public. The acceptance or rejection of them rested entirely with themselves.

If the conditional assent, given by the corporation of *Baltimore*, to the improvement, had, without reference to navigation, or the protection of the facilities thereof, secured to the corporation for its own benefit, a portion of the improvement, or of the wharfage arising therefrom, then would the condition, as such, be wholly inoperative and void. But such was not the conduct of the *Mayor and City Council of Baltimore*. They reserved nothing for the separate benefit of the corporation; but, as the protectors and guardians of navigation, stipulated exclusively for its preservation in securing to it, in exchange for the facilities surrendered, the equally important facilities to navigation resulting from the creation of the public wharf in question. We think, therefore, that the requisition, or condition, (or contract, if it may be so called,) under which the *Olivers* improvement was made, was, on the part of the *Mayor and City Council of Baltimore*, a legitimate exercise of the powers conferred on them, by the laws of the State, for the protection of the navigation of the port of *Baltimore*.

Assuming the wharf in question to be a public wharf, the collection of wharfage upon it formed a fit subject for State legislation; and the 4th section of the act of 1827, ch. 162, gives to the *Mayor and City Council of Baltimore*, the right to charge and collect the wharfage for which their action was instituted, and which is unlawfully withheld from them by the appellee, who has received it.

We concur with the county court in granting the defendant's third prayer, but dissent from their rejection of the

plaintiffs' prayers, and from the granting of the defendant's first prayer, and from the instruction given by the court to the jury, and therefore reverse its judgment.

JUDGMENT REVERSED AND PROCEDENDO ISSUED.

CHAMBERS J., dissented.