MAYOR AND CITY COUNCIL OF BALTIMORE, A
MUNICIPAL CORPORATION,

*vs.*

EDGAR ALLAN POE, JAMES BOOKER CLARK AND
JOHN M. LITTIG, RECEIVERS OF THE NOEL CON-
STRUCTION COMPANY OF BALTIMORE CITY, A BODY
CORPORATE.

EDGAR ALLAN POE, JAMES BOOKER CLARK AND
JOHN M. LITTIG, RECEIVERS OF THE NOEL CON-
STRUCTION COMPANY OF BALTIMORE CITY, A BODY
CORPORATE,

*vs.*

MAYOR AND CITY COUNCIL OF BALTIMORE, A
MUNICIPAL CORPORATION.

*Building contracts: decisions by third parties; extra compensa-
tion; certificate of engineer.   Municipal contracts:
waiver by municipal officers.*

Where a building contract expressly leaves to a third party
the determination of questions, as to "working days," "extra
work," etc., the decision of such person is final and conclusive,
provided his decision concerns the matter within the scope of
the submission and is made by such third party without fraud
or bad faith.                                            p. 643

The contract between the City of Baltimore and the con-
tractor for the building of part of the city's sewerage system left

certain calculations of working days, etc., to be determined by the architect; on several occasions reports of such findings were prepared and written for him by the City Solicitor; it appeared, however, that the architect rewrote the reports and made use of his own figures and calculations for the same: *Held,* that the certificates so prepared have the binding force to which they were entitled under the contract.        pp. 646, 647

Where the said contract provided that no claim for extra work should be allowed the contractor, unless it was ordered by the engineer and approved by the Sewerage Commission: *Held,* that this provision could be waived, and where it was proved that extra work had been repeatedly ordered by the City Engineer, with the understanding that such certificates would later be issued for the work, such course of action constitutes a waiver, and the question constituted an issue which should be submitted to the jury.                              p. 649

Section 27 of said contract provided that the City Engineer should give all lines and levels for the work: *Held,* that where the engineer gave wrong lines and levels, and the work done under them had to be taken out and done over again, the cost of the extra work was an issue which should have been submitted to the jury, provided the engineer refused to give an independent decision of the claim.                              p. 651

The sub-contractors under the contract were recognized by the city, and most of the work was done by them; as there was no privity of contract between such contractors and the city, they could not entertain separate suits against the city in their own name; but the receivers of the contractors who acted for all the creditors might include the claims of such agencies, for whose compensation they were responsible, in a suit on the original contract.                              p. 652

While subordinate officers of a municipal corporation may not waive or vary a contract, yet where by a continued course of dealing the parties to such a contract have ignored some of its provisions, the question of waiver is one proper to be submitted to the jury.                              p. 653

*Decided May 3rd, 1918*

Cross-appeals from the Superior Court of Baltimore City. (Dobler, J.)

The facts are stated in the opinion of the Court.

The causes were argued together before Boyd, C. J., Briscoe, Thomas, Pattison, Urner, Stockbridge and Constable, JJ.

*Robert F. Leach, Jr., Assistant City Solicitor,* and *S. S. Field, the City Solicitor,* for the City of Baltimore.

*J. Kemp Bartlett* and *Charles F. Harley* (with whom was *Robert D. Bartlett* on the brief), for the receivers.

Constable, J., delivered the opinion of the Court.

There are cross-appeals in this case; each party appealing from the judgment rendered in favor of the receivers of The Noel Construction Company.

The case arose out of the contracts awarded to The Noel Construction Company by the City of Baltimore through the Board of Awards for the construction of the Sewage Pumping Station near East Falls in Baltimore City. It was proposed by the city to erect the station building by two separate contracts: one for the substructure or foundation, called Contract No. 3, and the other for the erection of the superstructure, called Contract No. 4, and invited bids for that work. The specifications for Contract No. 3 provided that if that contract was awarded to one bidder, and the contract for the superstructure was awarded to another bidder the number of working days from the date of the commencement of the work to its completion would be limited to two hundred days, but that if the contracts for both the substructure and the superstructure were awarded to the same bidder the number of working days from the date of commencement to completion would be limited to 420 days. The same provision as to limit of time for completing the substructure and the super-

structure was made in the specifications for Contract No. 4; 220 working days if different bidders and 420 days if the same bidder was awarded both contracts.

The Noel Construction Company, being the lowest bidder for each of the two contracts, was awarded both.

Provision is made for computing what shall be working days under the terms of the contracts as follows:

> "Every day except Sundays and also except legal holidays on which no work is done, shall be considered a working day, provided that it is not unfitted either by wind, rain, snow or temperature for working out of doors.
>
> "The length of time (expressed in days and parts of days) during which the work has been delayed by any act or omission of the Sewerage Commission shall be allowed to the contractor and excluded from such computation."

Calvin W. Hendrick, Chief Engineer of the City, was in charge of Contract No. 3, or the substructure contract, and Henry Brauns, an architect, was in charge of Contract No. 4, or the superstructure contract. Contract No. 3 contained this provision: "The engineer shall determine the number of working days that the contractor is in default in completing the work to be done under this contract, and shall certify the same to the Commission in writing. * * * His determination and certificate shall be final and conclusive." Contract No. 4 contains the same provision except the architect is substituted for the engineer.

Provision is also made in the contracts that for each and every working day that the engineer or architect shall certify that the contractor is in default in completing the work to be done under the specifications, the contractor shall pay to the city the sum of thirty-five dollars, and that for each day the work may be completed before the time fixed in the contracts for such completion the contractor shall be allowed a premium of thirty-five dollars. Also the following provision:

"53. The contractor shall do such extra work as may be ordered in writing by the architect or engineer with the authorization of the Commission. No claims for extra work will be considered or allowed unless said work has been so ordered by the architect or engineer, nor unless the Commission shall approve such claim for extra work and certify in writing that in its opinion such extra work was necessary for the public interest, stating in the certificate its reasons."

And the further provision:

"14. To prevent disputes and litigations, the architect or engineer shall in all cases determine the amount or quantity, quality, acceptability and value of the work and materials which are to be paid for under this contract; shall decide all disputes, questions and doubts relating to the work and the performance thereof, and shall in all cases decide every question which may arise relative to the contract or to the obligations of the contractor thereunder.

"His determination and decision shall be final and conclusive upon the contractor and all whom he may employ to execute the various branches of the work, whether as sub-contractors or otherwise, and upon all parties from whom materials may be purchased, either by the contractor or by any sub-contractor. In case any question shall arise between the contractor and the city touching the contract, the estimate or certificate and decision of the architect or engineer shall be a condition precedent to the right of the contractor to receive any moneys under the contract."

Provision was also made that the contractor would be required to comply strictly with all the requirements of the building regulations and other ordinances of the City of Baltimore. And also the following provision was contained in both contracts:

"48. The Commission reserves the right to suspend the whole or any part of the work to be done hereunder, if it shall deem it for the interest of the

City of Baltimore to do so, without compensation to
the contractor for such suspension, other than extend-
ing the time for completing the work as much as it
may have been delayed by such suspension."

The purpose of this building was to receive by gravity all
the sewage from South and West Baltimore, and after treat-
ing it there to force it by means of gigantic pumps to the
disposal plant some miles away. It was necessary for carry-
ing out this purpose to have the foundations unusually strong,
and to insure that, the following provision was made in Con-
tract No. 3:

"68. It is expected that satisfactory material for
the foundations will be found at El. 23, but the con-
tractor shall carry the excavation to a greater depth
wherever, in the opinion of the engineer, such greater
depth is necessary to secure a suitable foundation. If,
on the other hand, a satisfactory foundation is found
at a less depth than El. 23, the excavation shall be
discontinued at that depth, if directed by the engi-
neer."

The contracts and specifications are contained in printed
books covering over 180 pages, and as it would be impossible
to reproduce them in full, we have confined ourselves to quot-
ing those which we consider most applicable to this contro-
versy.

The work on the substructure was begun on June 29, 1908,
and the whole building completed August 24, 1911, and
under date of August 25th and September 11, 1911, the arch-
itect and the engineer respectively certified to the Commis-
sion that the number of days the contractor was in default
under the contracts was 144¼ working days, at thirty-five
dollars per day, and therefore subject to damages of $5,-
083.75. The amount of money certified to be due under the
contracts less $5,083.75 was paid over to the contractor.

Receivers were appointed for the Noel Construction Com-
pany and this action was commenced by them on the 6th

day of January, 1916, for the recovery of the amount re-
tained as damages for failure to complete the work within
the specified 420 working days, for extra work performed,
damages incurred by the company through interference with
the work and for the recovery of $853.20 charged against the
contractor for insuring the building after it had been ac-
cepted by the Commission. The last item is conceded by the
city to have been charged in error against the contractor and
should be allowed to the plaintiff.

The trial Court held that neither the certificate of the
chief engineer nor the certificate of the architect was "techi-
cally a conclusive determination of the number of working
days in which the Noel Construction Company was in default
in completing the work to be done under the respective con-
tracts in evidence," and under a prayer of its own left to the
jury to determine whether the Noel Construction Company
finished the contracts under or beyond the number of days
limited by the contract. But also held that they were not
entitled to recover for other claims other than the insurance,
which was conceded.

From the ruling of the Court, upon the prayers, in hold-
ing that the certificates of the engineer and architect as to
the number of days in default were not binding and conclu-
sive upon the contractor, the city excepted and that question
constitutes its appeal.

At this date it can not be questioned what is the effect of
a provision in a contract expressly leaving to a third party
the determination of questions such as were left in these con-
tracts to the determination of the engineer and the architect.
The rulings of this State and the courts of all other States in
the Union, with the exception of Indiana, are uniform, as
to the effect of such a provision as in these contracts; that the
decision of such person shall be final and conclusive upon
parties to the contract, provided the decision concerns matters
within the scope of the submission, and is not subject to re-
view by the courts, if made by the third party in the absence
of fraud or bad faith. *M. & C. C.* v. *Aull,* 126 Md. 423;

*M. & C. C.* v. *Talbott,* 120 Md. 363; *Hughes* v. *Model Stoker
Co.,* 124 Md. 289; *Pope* v. *King,* 108 Md. 37; *Lynn* v. *B.
& O. R. R. Co.,* 60 Md. 414; 6 *Cyc.* 40.

Indeed the soundness of this principle of law is not ques-
tioned by either of the parties, but the plaintiffs contend that
the determination of these questions bearing upon the num-
ber of actual working days consumed in the work was not
made by those authorized to make the decision, but was the
result of influence of others.   There is, however, no claim
made that fraud or bad faith was exercised either by the
engineer or the architect.   The work on the substructure
started on June 29th, 1908, and was finished on March 21st,
1910, covering a period of 632 days.   The engineer certified
that of that number of days 188 were charged against the
contractor as actual working days.   From June 29th to
November 2d, 1908, the work progressed satisfactorily, and
ninety seven and a half days of the 188 were charged against
the contractor during that period.   At that time serious dif-
ficulty arose, growing out of interference, justly so made, by
the Building Inspector of Baltimore City, who claimed that
the excavation should go lower than it was planned to go.
The controversy between the engineer and the Building In-
spector was referred by the Sewerage Commission to an Ar-
bitration Board.   Many tests were made on behalf of the
Arbitration Board and on behalf of the Building Inspector
by driving piles, etc.

Of course during all of this period great delay was caused
the Noel Construction Company in carrying out the contract,
and on April 27, 1909, the company wrote the engineer re-
questing an extension of time between November 6th and
April 23rd, in which he claimed of the 143 days included
between those dates he should be allowed an extension of 101
days, or, in other words, that he should only be charged with
forty-two actual working days.   The engineer decided that
from November 2, 1908, to April 22, 1909, the contractor
should only be charged with forty working days.   It was
decided to carry the excavation a considerable distance below

elevation —23, in fact to carry it to elevation —31 in some instances; and because of this necessary extra work during the months of June, July, August, September and October the engineer charged them with only one and a half actual working days. During the delay the engineer was called upon to decide many questions. Some of these questions he himself decided, others he referred to committees or to the Sewerage Commission. On questions of time extensions, however, he decided all himself, with the exception that once, in his absence, when the Noel Construction Company asked for a three day extension in August, 1908, because of a storm, the acting engineer referred the determination to the Sewerage Commission, which granted the extension.

The engineer as of June 12, 1911, wrote to a special committee of the Sewerage Commission explaining how he arrived at the 188 working days which he charged to the contract for the substructure as follows: "The foundations were completed and turned over to the architect for work on the superstructure on March 21, 1910, making a total of 632 days. Of this total period there would be deducted 102 days for Sundays and holidays, and 41 days lost on account of bad weather, making a total of 143 days to be deducted from the total time, leaving the possible number of working days 489.

"On account of delay due to the action of the Building Inspector and the removing of certain undesirable material encountered below —23, called for in paragraph 68 of the specifications, there was to be a further deduction of 301 days, leaving 188 working days chargeable to the contractor of the substructure. The contractor, therefore, is entitled to an extension of 301 days due to the reasons set forth, and I would recommend that this extension be granted. The superstructure being entirely under the jurisdiction of the architect, I have nothing to do with that matter."

As to the certificate of the architect the plaintiffs claim that it was invalid as to its binding effect because it was made up at the dictation of the City Solicitor and others.

We find from the record, however, that while it is true he had a conference with the City Solicitor and members of the Sewerage Commission on October 26th, 1911, and that a certificate was prepared for his signature to be antedated as of August 25, 1911, that the architect practically re-wrote and forwarded that as his certificate to the Chairman of the Sewerage Commission, yet, nevertheless, the examination of the architect shows that he had no doubt as to the number of working days the contractor consumed on the superstructure, but that the doubt in his mind was caused by whether or not he could certify as to the number of days consumed on the substructure, with which he had nothing to do. As supplementing his testimony on this point that he had no doubt as to the number of days consumed there was introduced a letter from him under date of July 1, 1911, long before he had filed any certificate, to the Chairman of the Sewerage Commission as follows:

"Dear Sir: Replying to your inquiry of June 29, 1911, I beg to state that I have charged up against the Noel Construction Co. on account of their contract for the superstructure of the Sewage Pumping Station on Eastern Ave., from March 22, 1910, to June 30, 1911 (inclusive), three hundred and thirty-one and a quarter days."

The number of days appearing in this letter is exactly the number of days he certified to in his final certificate, and really the important thing in his certificate. The fact that there were two contracts and the engineer was in charge of one, and the architect was in charge of the other, and the two contracts were being executed by the same contractor, and the fact that the contract provided that the work on both contracts should be completed within 420 days rendered it unnecessary that the engineer should know of his own knowledge the number of working days consumed in the erection of the superstructure, or that the architect should know of his own knowledge the number of working days consumed in the construction of the substructure, but the important

thing was that each should know and be able to certify to the actual number of working days consumed in the work he had in charge and under his personal supervision. The number of days for which the contractor was subject to damages or entitled to premiums resolved itself into a mere calculation of addition and subtraction.

We are of opinion, therefore, that these certificates should have been given the binding force to which they are entitled under the law, and that there was error in refusing the 4th prayer of the city and in granting the Court's independent instruction.

Having disposed of the question involved in the city's appeal, we will now direct our attention to those arising in the receivers' appeal.

The trial began on the 2nd day of April, 1917, and the verdict in favor of the receivers was returned on the 8th day of May, 1917. Naturally, a great mass of testimony was taken with the result that the record in this case is a very large one, so in order to keep this opinion within reasonable limits, we will confine ourselves to stating our conclusions as reached from a careful reading of the record rather than setting out at length the testimony.

The plaintiff offered two prayers, one of which only was granted. The defendant offered 45 prayers, 34 of which the Court granted, refusing the other eleven. The defendant also filed two motions, both of which were granted by the Court. The eleventh to the 44th (inclusive) prayers of the defendant dealt separately with each claim of the plaintiff, other than the claim for the money retained by the city as liquidated damages for delays, seeking to withdraw those claims from the consideration of the jury. All of these prayers were granted by the Court, thus eliminating from the jury practically all of the claims of the plaintiff, other than the liquidated damages. From the number of these prayers, it is readily seen that the plaintiff made many claims. Many of these claims are for extra work performed and for which

the contractor had no certificate as provided in section 53, as follows:

> "The Contractor shall do such extra work as may be ordered in writing by the Engineer with the authorization of the Commission. No claim, for extra work will be considered or allowed unless said work has been so ordered by the Engineer, nor unless the Commission shall approve such claim for extra work and certify in writing that in its opinion such extra work was necessary for the public interest, stating in the certificate its reasons therefor."

The city's contention is, that none of these claims can be allowed in the absence of a certificate from the Commission approving such claims and stating its reasons for such approval.

The plaintiff contends, that under section 14, where it is provided that in case of disputes between the city and the contractor the engineer's decision shall be final and conclusive upon the contractor; that his reference of these questions to the Sewerage Commission for a decision made the conclusiveness of any such question inoperative.

This proposition is not open to attack as is shown in the cases we have cited above in reference to the city's appeal on the question of whether the certificates of the architect and engineer on the question of delays, was admissible. But, although it is certain that these disputes about extra work were submitted by the engineer to the Sewerage Commission, it was his plain duty under section 53 to do so, for the claims could not be allowed without the Commission should approve them, etc. Therefore to such a dispute as this we are of opinion that section 14 has no applicability.

While, no doubt, the provision contained in section 53 was for the purpose of making the production of the certificate a condition precedent to the validity of any claim for extra work, yet in this case we do not think that it should be so held for it is a well recognized rule of law in this State, and elsewhere, that a provision of this character may

be waived. *Filston Farm Co.* v. *Henderson,* 106 Md. 335; *Standard Brewing Co.* v. *Weil,* 129 Md. 487; *Lynn* v. *B. & O. R. R. Co.,* 60 Md. 404; *Pope* v. *King,* 108 Md. 37; *McEvoy* v. *Harn,* 129 Md. 97; *Reid* v. *Weissner Brewing Co.,* 88 Md. 237; 9 Corpus Juris. 760; *Headler* v. *Carileer,* 48 L. R. A. (N. S.), at page 576 notes under the heading "What Constitutes Waiver."

There is an abundance of evidence in the record tending to show that the course of dealing between the parties was on many occasions to ignore the provisions of section 53 about getting extra work orders before the commencement of the extra work. For instance, we will refer to testimony as to pumping, which was necessary because of the dispute between the engineer and the building inspector: "The pumping had to be done; and it was said to go ahead and do it and there would be extra pay for it, and not to wait for the order; we would often do that with extra work and they would say that the order would come down and sometimes the order would come down and sometimes it would not; in this particular case I don't know whether they sent an order or paid for it or not."

We are of opinion that, where the evidence tends to show that extra work was performed on the order of the engineer, or any of his subordinates, with the understanding that certificates would later be issued for such work, as we have said above was their course of dealing, that there was a waiver of the provisions of section 53 and the issue should have been presented to the jury.

As we have pointed out above, it was necessary to carry the excavations much below that at first expected and the engineer wrote to the Noel Construction Company on May 5, 1909:

"Gentlemen:

"It will be satisfactory to us for you to proceed with the excavation below 23 feet, according to the specifications at cost plus 10%. The absolute cost of the value of the pumping machinery employed in

pumping below 23 feet, to be paid for at the cost plus
10%. The cost of pumping and excavation above
23 feet, to be paid for at the cost plus 10%. The cost
of pumping and excavation above 23 feet to be segre-
gated from all pumping and excavation below 23 feet.
  "I will request the city to have electric light placed
over the work so that you can proceed with your night
work, which I wish you would do as promptly as pos-
sible."

After the completion of that part of the work the inspector
for the city omitted to include certain elements of actual
cost. The contractor presented to the engineer itemized bills
for these claims, but he referred them, without making any
decision, to a committee of the Sewerage Commission, which
never acted upon them. These items should have been pre-
sented to the jury.

For the purpose of removing the excavated material the
contractor had made arrangements with the Harbor Board
for the use of Jones Falls and had purchased from the city
an old bridge which he removed to the edge of Jones Falls
and placed in position there for the purpose of using it as a
dumping pier of the material into scows. He used this
method for sometime, when he was notified by the Harbor
Board that the position of the dumping pier interfered with
the prosecution of another contract the city had, to wit: the
erection of a sea wall along Jones Falls at the point, and
was directed to cease that method of getting rid of the earth
and mud. He immediately suspended this method and tried
various other methods of disposing of the said material, but
at increased cost. It is to recover this excess cost which
constitutes one of his claims. We have been unable to dis-
cover any theory upon which this claim should be allowed.
We find nothing in the record anywhere which even suggests
that the city would provide or maintain ways and means for
assisting the contractor in disposing of this material. It was
solely a matter for the contractor himself to decide upon at
his own risk.

Section 27 provides:

"The Engineer will give all necessary lines, grades, elevations, etc., for the general guidance of the Contractor, who shall conform his work thereto. He shall provide the Engineer with such materials and assistance (except engineering assistance) as may be required to properly perform the services mentioned, and shall carefully preserve and maintain in proper position all marks given. Any work done without lines, levels, etc., having been given by the Engineer, may be ordered removed and replaced at the Contractor's sole cost and expense."

The plaintiff offered evidence tending to show that the engineer or one of his assistants in giving lines to the contractor for excavation for the foundation, gave wrong lines and claimed that all of that work had to be done over. We think under the above section that that should have been submitted to the jury providing the engineer refused to give an independent decision as to that claim.

The plaintiff's second prayer was properly refused for the reason that it sought to instruct the jury that if they found that the engineer referred the decision as to the validity of any of the plaintiffs' claims for allowance for extra work, etc., to the Sewerage Commission for decision, that then the plaintiffs are not precluded from recovery.

This instruction would have been erroneous under what we have said above as to the necessity of the engineer getting the approval of the Commission.

The eighth prayer of the defendant was granted and we think incorrectly for it is at least misleading.

The two motions, made by the defendant and referred to above were for the purpose of striking out all evidence tending to prove damages suffered by two of the sub-contractors of the Noel Construction Company and were improperly granted. The contractor had every right to sublet any part or all of his contract with the city. In every contract of this magnitude the general custom is to sub-let portions of it.

These sub-contractors were recognized by the city as the representatives of the contractor. They were the agencies by whom most, if not all, of the extra work was performed and the compensation for which work is now claimed by the receivers. They have filed their claims with the receivers and they have been approved.

There was no privity of contract between the sub-contractors and the city so, of course, they could not entertain separate suits against the city, but we can see no reason why the receivers, who act for all the creditors, should not include the claims of their agencies, for whose compensation they were responsible, in a suit brought upon the original contract.

The first exception arises over the refusal of the Court to admit in evidence time sheets relating to the value of extra work performed by one of the sub-contractors. We think following our ruling as to the liability of the city for the claims of the sub-contractors, if it is shown that the extra work orders were on the promise that certificates would be issued, that this evidence was admissible and its rejection constitutes error. This is upon the assumption that the work for which the time sheets were offered were not in connection with the changed method of removing the earth. We say "assumption," because it is not very clear from the record exactly what character of work was shown by these time-sheets.

The second exception relates to the refusal of the Court to permit a witness to state what labor was employed in removing the dumping pier. This, of course, was a proper ruling.

The third exception had to deal with the subject which we have heretofore discussed, that of depriving the contractor of the use of the dumping pier at the edge of Jones Falls. What we have already said upon that subject disposes of this exception and we therefore hold that the exception should be overruled.

The fourth exception should be overruled.

The fifth exception relates to the introduction in evidence of extracts from the minutes of the Sewerage Commission. We do not see upon what theory their admission could stand.

The sixth and seventh exceptions relate to the motions made by the defendants to strike out all testimony showing damages suffered by the sub-contractors and have already been discussed above.

We have not referred specifically to each of the prayers granted on behalf of the defendant for the reason that since the case will have to be retried, the Court in passing upon similar prayers will be governed by the principles which we have indicated controls them.

> *Judgment reversed, case remanded for a new trial, each party to pay one-half the costs in this Court, the costs in the Court below to abide the final result.*

---

NOTE:—A motion having been made for a modification of certain of the language contained in the foregoing opinion, it is deemed proper to add this note: The foregoing opinion does not and was not intended to hold that it lay in the power of *every subordinate* to vary the terms of a contract and bind the principal by such act; what the opinion does declare is, *and is only,* that where by a continued course of dealing the parties to a contract have ignored a provision of that contract not once, but repeatedly, the question of waiver is one proper to be submitted to a jury.

*Filed July 10th, 1918.*