**MUTUAL CHEMICAL CO. OF AMERICA
et al. v. MAYOR AND CITY COUNCIL
OF BALTIMORE et al.**

Civ. No. 201.

District Court, D. Maryland.

July 11, 1940.

Mullikin, Stockbridge & Waters, Addison E. Mullikin, and Philip B. Perlman, all of Baltimore, Md., for Mutual Chemical Co. of America.

Marbury, Gosnell & Williams, L. Vernon Miller and William L. Marbury, Jr., all of Baltimore, Md., for Aluminum Ore Co.

Charles C. G. Evans and Allen A. Davis, both of Baltimore, Md., for Mayor and City Council of Baltimore.

Edwin M. Sturtevant and Alfred P. Ramsey, both of Baltimore, Md., for Consolidated Gas, Elec. Light & Power Co.

COLEMAN, District Judge.

This is a suit involving riparian rights along the Patapsco River, Baltimore Harbor, and grows out of the establishment by the Mayor and City Council of Baltimore of a municipal airport.

■ There are two plaintiffs, the Mutual Chemical Company of America, a New Jersey corporation, whose property adjoins the new airport development, and the Aluminum Ore Company, a Delaware cor-

poration (superseded since the filing of the suit by the Crown Cork & Seal Company, as successor in title), between whose property and that of the Mutual Chemical Company of America lies the property of the various defendants, thirty in number. Jurisdiction of this Court is asserted, and has been accepted, on the ground of diversity of citizenship, all of the original defendants being citizens of States different from those of the original plaintiffs. 28 U.S.C.A. § 41 (1); Hardenbergh v. Ray, 151 U.S. 112, 14 S.Ct. 305, 38 L.Ed. 93; St. Paul Mercury Indemnity Co. v. Cab Co., 303 U.S. 283, at page 295, 58 S.Ct. 586, 82 L.Ed. 845, and cases cited; Camp v. Gress, 250 U.S. 308, 39 S.Ct. 478, 63 L.Ed. 997. Not all, but a number of the defendants, have filed answers, by which they join in the request of the plaintiffs for the adjudication of the riparian rights of all of the interested parties, with the exception of (1) the Mayor and City Council of Baltimore, who in their answer deny the jurisdiction of this Court to adjudicate such rights; and (2) the United States (made a party defendant because owner, for the Department of Agriculture, of one of the parcels of land whose riparian rights are here involved), which also moved to dismiss the bill of complaint as against it, for lack of jurisdiction. Decrees pro confesso have been duly entered against the other parties defendant who were duly summoned, but who failed to answer the complaint.

■■ Preliminary to the hearing on the merits, the aforementioned objections of both the United States and the City of Baltimore were heard. The latter's objections were overruled, this Court concluding that, by established equitable principles, it had jurisdiction of the subject matter of this proceeding, and should determine the relative riparian rights of all the parties hereto and enjoin the impairment, if any, of such rights. The complaint is one of misuse or abuse of municipal administrative authority affecting private rights, and the jurisdictional requirements as to diversity of citizenship being satisfied, the case is clearly one for adjudication in a Federal Court upon the same principle as a similar suit is maintainable in a State Court. It is not inconsistent, as the City contends, with such decisions of the Maryland Court of Appeals as Classen v. Chesapeake Company, 81 Md. 258, 31 A. 808 and Cahill v. Baltimore, 173 Md. 450, 196 A. 305, for this Court to assume jurisdiction. See Baltimore & Ohio R. R. Co. v. Chase, 43 Md. 23; Lancaster v. Kathleen Oil Co., 241 U.S. 551, 36 S.Ct. 711, 60 L.Ed. 1161; Euclid v. Ambler Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016. However, the objections of the United States, on the ground that it could not be required to appear and answer the complaint, because there was no consent on its part to be sued, and that such lack of consent was not supplied by any statutory provision, were sustained. Wood v. Phillips, 4 Cir., 50 F.2d 714. Thereupon, the Government moved, and was permitted, to intervene as a party plaintiff.

Introductory to a statement and consideration of the material facts in the case, relating to the location of the various pieces of property affected by the present suit, and the positions assumed by their owners, it will be well to summarize, first, the evolution of the Maryland law with respect to the rights of riparian owners on navigable waters within the State; and second, the evolution of Federal and State regulation affecting such rights.

■ The State, since earliest times, has owned the bed of all navigable streams within its boundaries; and in Colonial times, the State freely deeded the title to such beds by patent. After 1729, when Baltimore first became an incorporated town, the sovereign rights of the State were curtailed in favor of the landowner, in so far as his right to accretions and to improvements made into the water. See Kilty Laws of Maryland, Vol. 1, 1745, Chapter IX; Acts of 1862, Chapter 129; Article 54, Maryland Code Ann.1924, Secs. 46, 47 and 48. As a result, while at the present time the State remains the owner of the legal title to all beds of navigable streams within its boundaries, it cannot grant the same away, nor can it take away the right of the owners of lands bordering on navigable waters, to make improvements in front of their shore lines, this right being defined as "a franchise,—a vested right peculiar in its nature, but a quasi property, of which the lot owner cannot be lawfully deprived without his consent." Baltimore & Ohio R. R. Company v. Chase, 43 Md. 23; see also Baltimore v. St. Agnes Hospital, 48 Md. 419; Garitee v. Baltimore, 53 Md. 422; Classen v. Chesapeake Co., 81 Md. 258, 31 A. 808; Cahill v. Baltimore, 173 Md. 450, 196 A. 305.

■ The rights of riparian owners, as above established under Maryland law, are,

however, subject to the power of the Federal Government, under the Constitution, to regulate navigation, and to a similar power vested in the State, in so far as it is concurrent and consistent with the dominant power of the Federal Government.

■ Thus, the Secretary of War is authorized, when the establishment of harbor lines is essential to the preservation and protection of harbors, to cause such lines to be established "beyond which no piers, wharves, bulkheads, or other works shall be extended or deposits made, except under such regulations as may be prescribed from time to time by him." 33 U.S.C.A. § 404. Pursuant to this authority, in 1917 the Secretary of War established the bulkhead and pierhead lines in the section of Baltimore Harbor with which we are concerned in the present suit. These lines having been so established, in so far as the Federal Government is concerned, shoreowners may, at will, make whatever improvements beyond their shore front they may see fit to make, provided the same do not extend beyond the limits defined by such lines. However, as already stated, such discretion is subject to the further regulatory power of the State of Maryland, which from very early times, the State has exercised. In 1783, Port Wardens were appointed for the City of Baltimore whose assent was first required before any wharf, etc., might be erected. See Kilty Laws of Maryland, Vol. 1, Chapter XXIV. This was followed by appropriate legislation in succeeding years. Kilty Laws of Maryland, Vol. 2, 1796, Chapter LXVIII; Baltimore City Charter 1938, Art. 6 (8), page 15. See City of Baltimore v. White, 2 Gill 444, 458; Wilson's Lessee v. Inloes, 11 Gill & J. 351. Pursuant to this authority, the City, even prior to the establishment of pierhead and bulkhead lines by the Government, fixed what were called Port Warden lines, corresponding with the lines subsequently established by the Federal Government. It was not until 1880, however, that really adequate provision was made for the granting of permits for pier or bulkhead extensions. In that year, the Harbor Board of Baltimore City was authorized to study and submit plans looking to the equitable apportionment of the riparian rights within the then limits of the City of Baltimore, and within four miles therefrom. See Resolution 131, approved May 2, 1880; Ordinance No. 83, approved May 17, 1881; Resolution 139, approved May 5, 1885; Ordinance No. 116,

approved June 13, 1894; Ordinance No. 293, approved April 10, 1909; Baltimore City Code 1927, Art. 15, Sec. 11. By the latest of these enactments, "The Pierhead Line of 1900 established for the Patapsco River by act of the Secretary of War and the lines inside the Pierhead Lines in the portions of the Harbor shown on Plats numbered from 1 to 5, signed by the Mayor and the Harbor Engineer under Ordinance No. 116 of 1894, are hereby declared to be the limiting lines beyond which no structures shall extend."

■ At the present time, the Harbor Engineer of the City of Baltimore is head of the Bureau of Harbors, which is a subdivision of the Department of Public Works, and, as such, has authority to grant all permits for improvements out from the shore line, subject to the control, direction and supervision of the Chief Engineer of Baltimore. Charter and Public Local Laws of Baltimore City, 1938, Section 105, Part I; same, subsection 4; Section 558. By its Charter, the City is given the right, concurrently with that of the Federal Government which, as above pointed out, the Federal Government has exercised, to establish pierhead and bulkhead lines opposite the land involved in the present proceeding, by the establishment of such lines throughout the entire length of the Patapsco River and its tributaries. This authority thus given is as follows: "To provide for the preservation of the navigation of the Patapsco River and tributaries, including the establishment of lines throughout the entire length of said Patapsco River and tributaries, beyond which lines no piers, bulkheads, wharf, pilings, structures, obstructions or extensions of any character may be built, erected, constructed, made or extended; * * * to erect and maintain and to authorize the erection and maintenance of, and to make such regulations as it may deem proper, respecting wharves, bulkheads, piers and piling, and the keeping of the same in repair, so as to prevent injury to navigation or health; * * *." Charter and Public Local Laws of Baltimore City, 1938, Sec. 6, sub-section 8. However, the City has never exercised this right in such form, but in so far as the property owners, parties to the present suit, are concerned, has insisted upon a separate, special plan of apportionment of their riparian rights, and it is the City's insistence upon this plan which forms the basis of the present controversy. Clearly,

from the above quoted provision of the Charter, the City has the right to deal with the matter of apportionment in separate parts, provided the separate treatment is fair and equitable to all property owners affected thereby. This brings us, therefore, to the precise factual situation in the present case.

The United States Government having fixed the present bulkhead and pierhead lines in 1917, on March 12, 1928, the then Mayor of Baltimore, Mayor Broening, filed application with the War Department for a permit to construct a municipal airport, pursuant to appropriate legislation, abutting upon the northerly boundary of the property of one of the plaintiffs, the Mutual Chemical Company of America. It was originally intended by the City to incorporate, within the boundaries of such airport, all of the water front to the northerly boundary line of the Aluminum Ore Company, the City's southern bulkhead line, as thus planned, to be a line perpendicular to the United States pierhead and bulkhead lines, as previously established in 1917, commencing at a point where the northerly boundary of the Aluminum Ore Company intersects the shore line.

At a meeting duly called at the office of the United States Engineer, War Department, in Baltimore, for the purpose of considering the City's application, the Aluminum Ore Company filed objections to the allowance of the requested permit to the City, unless the Ore Company were permitted to improve in front of its land to the same extent as the City was to be permitted to extend out. The matter was later amicably adjusted by the City's consenting that the Ore Company might extend its improvements into the river, co-extensive with the corresponding rights granted the City, and on July 16, 1928, the War Department granted a permit to the City to proceed with the construction of the municipal airport, the southerly line being fixed as a line running into the Patapsco River from the northerly boundary line of the Ore Company's property S. 67°, 11′ 7″ W.

On December 5, 1928, the War Department granted a second permit to the City, whereby the area of the proposed airport was reduced to its present dimensions, making the southern bulkhead line of the airport substantially perpendicular to the existing United States pierhead line, and running N. 66°, 45′ 25″ E. Thereupon the City adopted this line as a basis, and

through the then Harbor Engineer, Mr. Hammond, apportioned the riparian rights of the property owners to the south of the proposed airport, by dropping lines from their respective boundary lines at the shore line parallel with this south boundary line of the proposed airport, with the result that they were substantially perpendicular to the United States pierhead and bulkhead lines.

On October 21, 1929, the Chemical Company was granted a permit by the City Harbor Engineer to fill out in front of its property, using the southern boundary line of the proposed airport as established according to the so-called Hammond plan, just referred to. In 1933, an additional permit was granted to the Chemical Company on the same basis, and pursuant to these permits, extensive improvements were made, the fill covering some 18 acres. Meanwhile, construction of the proposed airport progressed in accordance with the permit of December 5, 1928.

The following year, 1934, the then Harbor Engineer, Mr. Kipp, called a meeting of property owners, the stated object of which was to adopt the necessary legal means to definitely establish the riparian rights of the various property owners, in accordance with the so-called Hammond plan, above referred to. As a result of this meeting, which was attended by many of the affected property owners, the matter of defining their legal rights was referred to their respective counsel. After various minor adjustments between certain of the property owners, notably an agreement between the Consolidated Gas, Electric Light & Power Company of Baltimore, one of the defendants herein, and the Aluminum Ore Company, plaintiff, whereby the latter acquired 34.68 more feet on the Government bulkhead line; and also with Donald D. McCurley, another defendant in the present proceeding, whereby he acquired a somewhat larger water area, a new plat, agreed to by all of the affected property owners, was adopted by the Harbor Engineer on November 10, 1936, after having been approved by the City's Law Department. This plat was submitted to all of the property owners with the recitation that "it permanently defined the division line between said airport and the area under water upon which the fast land immediately east of the airport abuts," and the Harbor Engineer called a meeting for December 15, 1936, for the purpose of having the

plan approved. The meeting resulted in such approval by nearly all of the property owners. Meanwhile, in the course of making the fill for the airport, large quantities of mud had seeped through the bulkhead into the water in front of the Chemical Company's property, which the Chemical Company claimed was due to the negligence of the City, and it brought suit for damages against the City in this Court on April 17, 1936, trial of which has been postponed at plaintiff's request, pending the outcome of the present controversy.

Thereafter, in 1938, in spite of the adoption of the so-called Hammond plan, the Harbor Engineer refused to grant any permits for water front improvements in this locality unless and until acceptance was had of a new plan which he caused to be prepared and presented,—referred to in these proceedings as the Pagon plan, from the name of the City's consulting engineer who prepared it,—reapportioning all of the riparian lines whereby all of the property owners except the City, and especially the plaintiffs herein, were adversely affected in relation to what had been accorded them under the Hammond plan. The primary object of the City in presenting this new plan was to secure an additional 500 feet of water space on the south side of the airport, in order to provide additional length for its north and south runways. Voluntary agreement between the City and the private property owners proved impossible, and the present suit followed, the bill of complaint being filed on May 6, 1939.

Summarizing the claims of the plaintiffs and defendants in the present suit, other than the City, based upon the aforegoing facts, they are as follows: That the City has continuously from 1928 to 1937 recognized the line north 66°, 45' 25" E. as the fixed southerly limit of its riparian rights, in accordance with the City's so-called Hammond plan, and that so far as concerned the City, the water to the south of this line might be apportioned among the property holders in such manner as they might agree upon; or, in the absence of such agreement, in such manner as might be established by competent legal authority; that there was never any dispute between the City and the plaintiffs and the other defendants as to this southern boundary line from the time of its original establishment in 1928, until the Mutual Chemical Company, one of the plaintiffs, filed its suit in this Court in 1937 against the City for damages for unauthorized filling upon the

Chemical Company's property, after which the City drafted a new and different plan whereby it might gain additional water space, to the south of the proposed airport, at the expense of the plaintiffs and the other defendants, in that their riparian rights are thereby curtailed, contrary to the 1928 plan and agreement; that the City, having proposed, prepared, adopted, and caused the plaintiffs and the other defendants to adopt, the apportioning of riparian rights in accordance with the so-called Hammond plan, the plaintiffs and the other defendants have acted in reliance upon this action of the City, and some have spent money as a result of such reliance, and that therefore the City cannot now repudiate what it has done; that independently of the fact that the City is bound by reason of its prior conduct, the Hammond plan is the most reasonable, equitable plan that can be adopted for all parties in interest; that the Mutual Chemical Company, one of the plaintiffs, whose property is contiguous to the City's property, is clearly entitled, under the Maryland decisions, to have a court of equity determine, as between itself and the City, their dispute over the boundaries of their contiguous riparian rights; that this being true, if, in making such a determination, the Court cannot do so with equity to all other property owners in the vicinity without treating the problem as a unit, the Court has jurisdiction to do so, and must do so, all such property owners being parties to the present suit; and that also, the Mutual Chemical Company has a right to join any one or more of these other property owners as party defendants, if they have not themselves appeared as plaintiffs, because, since the riparian rights of the Mutual Chemical Company, or of any other property owner in the vicinity, cannot be separately established, but must be established in relation to all of these other property owners, the proceeding clearly gives rise to a controversy between each and every one of the property owners, regardless of their designation as plaintiffs or defendants.

The defences of the City to the aforegoing may be summarized as follows: (1) The riparian right lines which the City is entitled to adopt are fixed and determined by the deeds by which the Mutual Chemical and the property owner contiguous to it on its southern boundary, namely, Sanford Brooks Company, one of the present defendants, acquired their property, and also

by virtue of Section 47 of Article 54 of the Maryland Code, which declares that the right to make improvements into the waters in front of one's land is confined to the front of the given lot, and must be within the side or outline of such lot extended to the bulkhead or pier lines; (2) that by virtue of the aforegoing, what the Harbor Engineer or other City officials did by proposing and adopting, and getting the plaintiffs and the other property owners, parties hereto, to adopt the Hammond plan, and by issuing permits to the Mutual Chemical Company to proceed in accordance with said Hammond plan, constituted ultra vires acts on the part of such City officials and that, therefore, the City cannot be estopped by the same, without some corporate act of ratification or adoption, namely, without the passage of a City ordinance.

In order to determine whether the contentions of the City or of the plaintiffs and the other defendants should be sustained, it is necessary first to consider what are the established legal principles, or rules, for apportioning property owners' rights upon a bulkhead line such as has been lawfully established in the present instance by the United States.

The following general rules for the apportionment of riparian rights are firmly established: If the shore line is straight, the riparian lines are to be extended from the divisional lines on shore into the water, perpendicular to the shore line. If, on the other hand, the shore line is concave, converging lines shall be run from the divisional shore lines to the line of navigability. City of Baltimore City v. Steamboat Co., 104 Md. 485, 498, 65 A. 353. If the shore lines are convex, the lines will be divergent to the line of navigability. Surveying and Boundaries, by Frank Emerson Clark, Secs. 268, 269. However, it is self-evident that each of these rules cannot be strictly applied where irregular shore lines are involved, if all affected property owners are to be treated equitably. So, modifications have been enunciated in various State Court decisions, notably in Deerfield v. Arms, 17 Pick., Mass., 41, 28 Am.Dec. 276; Gray v. Deluce, 5 Cush., Mass., 9; Thornton v. Grant, 10 R.I. 477, 14 Am.Rep. 701, and Aborn v. Smith, 12 R.I. 370. In this latter case, the rule established was that the dividing lines between the water fronts shall be lines drawn from the shore divisional lines to the harbor line, so as to intersect the harbor line

at right angles. This, as we have seen, is the rule adopted by the City of Baltimore in 1928, with respect to the other parties to the present suit, and is the rule which these parties are now contending for.

In the course of its opinion, the Court in Aborn v. Smith, supra, said (12 R.I. page 371–373, italics inserted):

"*The complainants claim a frontage on the harbor line proportionate to their shore line. If they are so entitled, the other proprietors within the harbor line are likewise so entitled, other things being equal; and it follows that their water front cannot be determined without simultaneously determining every other water front, for every front will be affected by irregularities of the shore either above or below it.* For example: under the rule contended for, the proprietor of the elbow in the shore, having a long shore line, will be entitled to a long frontage which will swing the dividing line between him and the next proprietor aslant, and the result will be a corresponding obliquity on all the water fronts and dividing lines above it. And so any considerable curvature or indentation anywhere will have similar effects.

"The rule invoked by the complainants is a rule borrowed from a work on the civil law, which was applied by the Supreme Judicial Court of Massachusetts to the apportionment of alluvion in the bend of an innavigable river. Deerfield v. Arms, 17 Pick. [Mass.] 41 [28 Am.Dec. 276]. The rule has been approved as a rule for the apportionment of alluvion in New York and in the Supreme Court of the United States. O'Donnell v. Kelsey, 10 N.Y. 412, 415; Nott v. Thayer, 2 Bosw. 10 [15 N.Y. Super.Ct. 10]; Johnston v. Jones, 1 Black, 209 [17 L.Ed. 117]. It has also been applied, but not invariably, to the apportionment of tide-flowed flats lying in a cove or littoral recess, among the owners of the upland. Rust v. Boston Mill Corporation, 6 Pick. [Mass.] 158; Wonson v. Wonson, 14 Allen [Mass.] 71, 85; Delaware, Lack. & West. R. R. Co. v. Hannon, 37 N.J.Law, 276. In Gray v. Deluce, 5 Cush. [Mass.] 9, flats lying in a shallow cove were divided among the owners of the upland by drawing parallel lines from the ends of the division lines of the upland at right angles with a base line across the mouth of the cove. This rule seems to have met with approval in Stockham v. Browning, 18 N.J. Eq. [390] 391. In Atty. General v. Boston Wharf Co., 12 Gray [Mass.] 553, 558, the

court say that, 'in general, where there are no circumstances or peculiarities in the formation of the shore or the course of the channel, the lines of division are to be made to the channel in the most direct course from the lateral boundaries of the several tracts of upland to which the flats are appended.' *We are not advised that any rule has ever been laid down for a case like the one at bar.*

"*The problem here is to define water fronts in regard to a harbor line, not to divide flats or alluvion.* The establishment of a harbor line, we have held, amounts to an implied permission to the riparian proprietors within it to fill out to it. The question is, how fill out to it? We answer, fill straight out to it. The owners of the upland are impliedly permitted to carry the upland forward to the harbor line so that each owner will occupy the part which is abreast his own land. There may be exceptional cases where the shore or the harbor line is so peculiar that permission to fill straight out cannot be implied. Perhaps it cannot be implied at the elbow which we have mentioned in the shore, where the harbor line diverges from a direct course; if there are several estates there, it cannot. The mode of filling in that case must be varied. But the variation ought to be limited by the necessity for it. It would be impracticable now, after so many fronts have been filled, to allow it to affect the apportionment along the whole harbor line, even if originally it would have been right and expedient. We do not perceive that it will be necessary to allow it to have any effect on the decision of the case at bar, the elbow in the shore being considerably below the estate in controversy. *It follows that the dividing line between the water fronts here, in case the parties have not established one for themselves, is a line drawn from the shore end of the dividing line of the upland to the harbor line so as to intersect it at right angles. This rule is analogous to the rule laid down in Gray. v. Deluce, and to the rule applied by us in Thornton v. Grant, 10 R.I. 477, 487 [14 Am.Rep. 701], to the ascertainment of water fronts where no harbor line existed. It has the great recommendation of simplicity of application.*"

This rule has been frequently followed where established harbor lines exist. See Columbia Land Co. v. Van Dusen Investment Co., 50 Or. 59, 91 P. 469, 11 L.R.A., N.S., 287; Hathaway v. City of Milwaukee, 132 Wis. 249, 111 N.W. 570, 112 N.W. 455, 9 L.R.A.,N.S., 778, 122 Am.St.Rep. 975; Lowndes v. Wicks, 69 Conn. 15, 36 A. 1072; Dooley v. Procter & Gamble Mfg. Co., 77 Misc. 398, 137 N.Y.S. 737; Campau Realty Co. v. Detroit, 162 Mich. 243, 127 N.W. 365, 139 Am.St.Rep. 555.

We agree with the position of the private property owners herein that this rule is the most equitable one, because it affords each property owner the right to go out in the most direct way not only to the Government pier and bulkhead lines, but to the channel, which is the valuable right; that is to say, under this apportionment, the fullest utilization of the respective properties for commercial purposes is afforded.

The so-called new, or Pagon plan, which the City seeks to force upon the private landowners is obviously discriminatory in that it affords the City advantages not accorded to the other property owners, for which we find no basis in the established legal principles. This plan adopts as one headland an arbitrary point in Colgate Creek near the intersection of the northern and western boundaries of the airport property, and adopting as the other headland, the same or approximately the same point on the property of the Aluminum Ore Company that was adopted in the Hammond plan, then apportions the space on the pierhead line—not the bulkhead line, which is shorter—in the same ratio as the respective properties have frontages on the shore line between the two headlands so adopted. Without analyzing all possible objections to the Pagon plan, obviously a major objection to it is that instead of giving each property owner a space on the bulkhead line substantially opposite his shore line, it runs all of the riparian lines at a tangent to this bulkhead line, with the result that the riparian lines defining the rights of the Aluminum Ore Company, run at such a tangent as to render attempt at using a great portion of that company's property impractical, so far as navigable rights are concerned. Likewise, if adopted, it would deprive the Mutual Chemical Company of its rights in a substantial part of the fills which it has already made at considerable cost, pursuant to permits granted to it by the City. Also, since there is no dispute respecting access to the bulkhead or pierhead lines except to those portions that are south of the new lines established by the Government, of necessity, after permission was granted to the City to project.

its fill, for purposes of the airport further out into the harbor than was permitted to any other property owner, there is no reasonable ground for including in the apportionment, shore line opposite bulkhead or pierhead lines not involved in the present controversy and which have acquired a different legal status.

As already shown, the following facts stand unrefuted. The City in 1928 first asked the Federal Government for a permit to be allowed to embrace, in its fill for the municipal airport, all of the riparian property here involved. Thereupon, the Aluminum Ore Company protested, but withdrew its protest upon assurances from the City that the boundary between its property and the southerly line of the municipal airport fill would be the perpendicular or 66° line, so on December 5, 1928, the Federal Government granted to the City a permit with this perpendicular line established as such boundary. Thereafter, the City Harbor Engineer adopted this, and sent out to all affected property owners a plan based upon this permit; and stated that it would be put into effect if no protest were received by a certain time. No protest being received, permits were issued in 1929 and 1933 by the then Harbor Engineers with the approval of the Board of Estimates. Several years later, that is to say, in 1936, an agreement was drawn up by Mr. Kipp, the then City Harbor Engineer, and was submitted in December, 1936, for the signatures of all affected property owners, the City taking the position that a formal agreement should be made of record, covering the acceptance by all of these property owners of the plan in 1928, and virtually all of them did accept. Up to the present time the Mutual Chemical Company has created about 18 acres of fast land, and has built two bulkheads pursuant to the two permits issued by the City to it, above referred to, all in accordance with the 1928 plan.

When the Mutual Chemical Company acquired its property in 1917, the City owned none of its present property, that is to say, it did not own any property contiguous to that Company's property, or to any other property here involved. The fact that the Mutual Chemical Company in that year built a pier out in the direction referred to in the deed of its contiguous neighbor, the Sanford Brooks Company, which was therefore an encroachment upon what we now find to be the latter's riparian right, is not conclusive. It cannot operate as an estoppel against the Chemical Company in the present controversy. Title to the under water land is in the State, and remains there until improvements are lawfully made. Thus, the lines called for in a property owner's individual deed cannot control if in derogation of the riparian rights common to a group of property owners; and in fact, the City's position is not based upon any provision in its, or the Mutual Chemical Company's deed with respect to how the lines shall be projected, because none of these deeds calls for any specific projection, but merely grants all appurtenant riparian rights. The City's position is really based upon the fact that the north line of the Sanford Brooks deed calls for a straight line projection. As a matter of fact, the Mutual Chemical Company would have obtained more bulkhead and pierhead frontage by adhering to the plan implied in the projection of its pier, namely, by a straight line projection, because the angle at which the straight parallel lines would have converged upon the bulkhead and pierhead lines would have resulted in giving them greater length on such lines, than does the 1928 plan. Also the 1928 plan has required the Mutual Chemical Company to admit that their pier is over on the Sanford Brooks property.

As confirmatory of the aforegoing, it is significant that one of the deeds of one of the other property owners, party defendants, namely, the Consolidated Gas, Electric Light & Power Company, also recites that the line shall be extended straight out, while the deed to the other parcel here involved, owned by the same Company, does not. The Government's deed to the property lying north of the last mentioned property of the Gas Company does have such a recital, so the result is that, if we follow these deed recitals literally, the lines of the two Gas Company deeds would converge before meeting the bulkhead line. In other words, an absurd situation would be produced, directly contrary to the right of all property owners to have access to the bulkhead and pierhead lines.

It thus appears that the City should not be allowed to repudiate the position in which it has placed the Mutual Chemical Company and the other property owners here involved, because of their proximate positions, unless there is some strong reason for invalidating what the City, through its officials, has done.

890

It is clear that the Harbor Engineer had authority to do what he did by virtue of the City Charter provisions and other enactments already discussed. By this we do not intend to say that the Harbor Engineer can determine riparian rights except as such determination may be incidental to the exercise of his authority to regulate the use of the harbor, and, more specifically, the access to its channel.

So much for the effect of deed recitals, in and of themselves, upon the legal rights of the parties to the present controversy. But the City contends further that section 47 of Article 54 of the Maryland Code requires a straight line projection of the boundary lines to the bulkhead and pierhead lines. We say "contends", although it is difficult to understand how the City does so with any degree of seriousness, because the new, or so-called Pagon plan, upon which the City has insisted in lieu of the so-called Hammond plan, is a contradiction of this contention in that, as has been indicated above, it does not provide for a straight line projection of the boundary lines. The Code Section above referred to is as follows: "The proprietor of land bounding on any of the navigable waters of this State shall be entitled to the exclusive right of making improvements into the waters in front of his said land; such improvements and other accretions as above provided for shall pass to the successive owners of the land to which they are attached, as incident to their respective estates. But no such improvements shall be so made as to interfere with the navigation of the stream of water into which the said improvement is made."

The City endeavors to support its position by referring to the fact that in construing the Act of 1745, Chapter 9, Section 10 which was a supplement to the Act incorporating Baltimore Town, and which the Code section just quoted superseded, the Court of Appeals of Maryland in Baltimore & Ohio Railroad v. Chase, 43 Md. 23, page 36, said: "By the construction of this Act, as settled by the decisions of our predecessors, the right of the lot owner, fronting on the water, to extend his lot, or improve out, to the limit prescribed by the authorities of the city, is a franchise,—a vested right peculiar in its nature, but a quasi property, of which the lot owner cannot be lawfully deprived without his consent. And if any other person, without his authority, make such extension, no interest

or estate in the improvement vests in the improver, but it becomes the property and estate of the owner of the franchise. Casey's Lessee v. Inloes, 1 Gill [430] 510 [39 Am.Dec. 658]. But this right of the owner to improve out, is confined to the *front* of his lot, and must be within the side or outlines of the lot extended to the Port-warden's line." However, that decision did not involve the question here presented. There was quite a different sort of conflict between riparian owners. The point actually decided was merely that the right of improvement in cases of conflict between such owners, arising from the curvature of the shore of a river, is vested in the elder patentee and those claiming under him, and is not divested or in any manner impaired by a subsequent grant by the State.

A municipality is not exempt from the doctrine of estoppel, and may be bound by the acts of its officers if done within the scope and in the course of their authority. Rose v. Mayor & City Council of Baltimore, 51 Md. 256, 34 Am.Rep. 307; Mayor & City Council of Baltimore v. Poe, 132 Md. 637, 104 A. 360.

It has long been settled by Maryland law that, when a riparian owner has built a wharf in accordance with the directions of the proper authorities as to what portion of the bulkhead line he shall be entitled to, he cannot be deprived of his wharf by subsequent change of the method of apportioning of the bulkhead line, by which he received a different portion. Classen v. Chesapeake Guano Co., 81 Md. 258, 31 A. 808. While this case embraced facts not parallel with those here presented and had to do with the question of vested rights under city ordinances, as between two adjacent private owners, land fronting on the Patapsco River was involved, and the following statement in the opinion is important and very apposite to the present case (81 Md. page 264, 31 A. page 808): "The shore line of the river is concave, so that, if some of the riparian owners should build out wharves or piers in straight lines, the full width of their lots, to the pierhead or port warden's line, other riparian owners would be deprived of the privilege of building piers to the pierhead line, since the water front on the pierhead line is much less in extent than the shore line in the rear."

Therefore, the contention of the City is wholly without merit to the effect

that what the Mayor, the Harbor Engineer and other City officials did with respect to the adoption of the Hammond plan, commencing in 1928, was ultra vires and void, in the absence of some act of ratification or adoption by the City itself, namely, in the absence of a city ordinance to this effect, —unless there be substance to the City's contention that the apportioning of riparian rights can never be done except by special legislative act. But we find this contention is without merit, as evidenced by the following statement in Cahill v. Baltimore, supra, 173 Md. page 456, 196 A. page 308: "As the harbor grew the consent [to improve beyond the shore line] was given by the establishment of limiting lines, under special municipal ordinances. And since 1860, the city charter has empowered the Mayor and City Council to establish such pierhead lines. Code P.L.L. (1930), art. 4, § 6 (8)." The cases relied upon by the City, such as Baltimore v. Escbach, 18 Md. 276 and Baltimore v. Reynolds, 20 Md. 1, 83 Am.Dec. 535, are not in point. There the public officials were acting entirely *outside* the scope of their specially defined authority.

Applying the City's own argument that its officials were without power to put the 1928 plan into effect, fixing riparian rights, without a City ordinance, to the City's attempt now to force upon the private property owners, also without ordinance, a new and different apportionment from that to which they had agreed, the City officials must be said to be acting in an equally ultra vires manner. So, the City's position is totally inconsistent, and, viewed from any angle, is unreasonable and a breach of good faith with respect to the other parties to this suit. If the City needs additional property for any legitimate purposes, it may purchase or acquire the same by condemnation. It should not repudiate its contracts fairly entered into with its citizen tax-payers, through its authorized officials. The present situation is precisely the type embraced within the exception where court intervention was recognized as appropriate in Cahill v. Baltimore, supra, when the Court of Appeals of Maryland said, 173 Md. page 460, 196 A. page 310 (italics inserted): "*Cases of misuse of power*, or unconstitutional exclusion of single owners from privileges generally accorded, may possibly arise, and be found remediable by judicial action; * * *."

This case has been stressed by the city as favorable to its contentions. But quite the contrary is true, because the facts are different. It dealt with the validity of alleged conflicting city ordinances marking the limits to which a wharf could be extended into the Patapsco River. In the course of its opinion the Court said, prior to the statement just quoted (173 Md. page 454, 455, 196 A. page 307): "What in general, or in a particular case, may constitute 'front' of land from which under the Code provisions the owner may make improvements, and what, on the other hand, would be the side lines, are questions which may be reserved for further argument in another case, for it is found unnecessary to the decision of this one."

A decree will be signed establishing the respective riparian rights in the Patapsco River, Baltimore Harbor, of all the parties to this suit, as set forth in this opinion; and permanently enjoining the Mayor and City Council of Baltimore from making any fill or other improvements not in conformity therewith, in connection with the construction or maintenance of the City's airport.