*Kevin Donohue, et al. v. George Mavronis*, No. 2295, September Term 2023, Opinion by Kehoe, S.

**REAL PROPERTY**

In a dispute between neighboring property owners, one property owner had built a pier and bulkhead. The bulkhead was permitted to be landward of a marsh area. The accreted land formed a "toe" between the two properties. The trial court did not err in finding that the owner of the property with the pier was entitled to the accreted land. The accretion had occurred landward of a bulkhead that had been approved to be landward of a marsh area. The improvements were put in place to protect that property's shoreline.

**RES JUDICATA**

Res judicata did not apply to the parties' assertions as to the proper boundary line between the properties. Although there had been a settlement of a previous suit between the owners of the two parcels, there had not been a determination of the boundary line. Barring the parties from asserting their respective positions as to the boundary line would leave clouds on the titles to both subject properties.

**REMITITTUR**

Where there is competent evidence to support a jury's damage award, the court did not err by denying remittitur.

Circuit Court for Baltimore County
Case No. C-03-CV-21-003437

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 2295

September Term, 2023

_____

KEVIN DONOHUE, ET AL.

v.

GEORGE MAVRONIS

_____

Leahy,
Kehoe, S.,
McDonald, Robert N.
 (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Kehoe, J.

_____

Filed: August 27, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This appeal arises from the denial of the Appellants' motion for a judgment notwithstanding the verdict and motion for a new trial. The trial court heard competing claims between the parties regarding the boundary between two adjacent parcels of waterfront property. The trial court's consideration of the boundary line also addressed the questions of whether gardens and fences were erected on the Appellee's property and whether the Appellants trespassed. Given that the parties brought claims sounding in both equity and law, the court conducted various portions of the trial in and out of the presence of the jury, hearing argument and evidence regarding the boundary line without the jury, and evidence regarding the tort claims with the jury present.[1] Both parties contest the

---

[1] Some of the factual issues in the case were left to the circuit court judge. Ordinarily, when there are legal and equitable claims, the jury finds the facts and the judge decides whether equitable relief is warranted based on the facts found by the jury. If there is a declaratory judgment claim, and the parties would have had the right to a jury trial before the enactment of the declaratory judgment statute, the jury finds the facts and the judge issues a declaration based on the jury's findings. *See Kann v. Kann*, 344 Md. 689, 700 (1997).

But here, the trial court explained,

This case was tried before a jury. However, the declaratory judgment portion of the case was solely within the purview of the [c]ourt and some testimony and evidence on the declaratory judgment portion of the case was produced outside of the jury.

Counsel for the Dettys and Mr. Donohue had moved to bifurcate the proceedings to separate consideration of the cross petitions for injunctions and cross petitions for declaratory judgment from the jury's consideration. Before denying the motion, the court heard arguments from counsel. Counsel for the Dettys and Mr. Donohue argued that it was the province of the court to determine the factual issues underlying the declaratory judgment count. Citing *Higgins v. Barnes*, counsel for Mr. Mavronis argued that the factual issues should be submitted to the jury. 310 Md. 532 (1987). When the trial court stated that it would consider the facts underlying the declaratory judgment and advise the jury of his determination, no one objected to that approach. Although there is an appeal of the circuit

court's determination of the boundary line, and the Appellants also challenge the denial of the motion for a new trial.

## BACKGROUND

### *Disputed Property*

The adjacent parcels of Appellant Kevin Donohue ("Mr. Donohue") and Appellee George Mavronis ("Mr. Mavronis") sit on the northern bank of the Haddaway Creek, which flows west-southwest into the Patapsco River. Mr. Mavronis has resided at 2048 Jarsey Avenue, the eastern lot, since he purchased it in 1979. Mr. Donohue purchased 2535 Snyder Avenue, which lies on the western boundary of 2048 Jarsey Avenue, in 2020, and subsequently entered an oral rent-to-own agreement with Appellants Michael Detty ("Mr. Detty") and Angel Detty ("Ms. Detty"), who currently reside on the property.

The property line in dispute has either two or three legs, according to the parties' surveys. The first stretch, which the parties agree on, descends from the northwestern corner of the Mavronis lot southward until it breaks south-southeast toward Haddaway Creek; the parties do not agree on the angle at which this second stretch extends. Regarding the third leg, Mr. Mavronis submits that about 15 to 20 feet before the boundary meets the Haddaway Creek, it returns to southern tack and stretches about another 47 feet, creating, as to Mr. Mavronis's property, what the parties have dubbed the "toe": a narrow, triangular piece of land whose southeastern boundary is a bulkhead attached to a pier and whose

_____

court's declaration as to which survey was to be used to define the property line, no one is complaining about the trial court's approach to consideration of the facts, and therefore, the propriety of the court's actions is not before us. Md. Rule 8-131.

2

western side abuts the Donohue property. The bulkhead is approximately 36 feet long. Mr. Donohue and the Dettys contend that the second leg of the property line extends straight to the creek, rendering the toe, and a portion of the bulkhead, their property.

### *Procedural History*

The proceedings in the trial court were initiated by Mr. Mavronis. He sued Mr. Donohue, as well as Michael and Angel Detty, after the Dettys erected a chain link fence along what they contended was the property line directly to the water line.[2] This fence cut through Mr. Mavronis's garden. Mr. Mavronis alleged that the fence trespassed on and physically damaged his property. The Complaint sought to enjoin Mr. Donohue and the Dettys from encroaching on his property, to hold the Appellants liable for trespass upon his property and a declaratory judgment as to the exact boundary between the two properties. Mr. Donohue and the Dettys contended that the garden encroached on their property. Their counterclaim sounded in negligence, nuisance, and trespass, and they likewise requested declaratory judgment and injunctive relief.

### *Factual Background*

Although the parties were unacquainted until 2020, when the Dettys moved into the Snyder Avenue house, they presented evidence concerning events beginning in the late 1970s. The origin of the "toe," the legality of its construction, and the legal mechanisms governing its apportionment were all contested at trial, and the court heard testimony from

---

[2] The Complaint also named Joseph Pirog, Jr. as a defendant. Mr. Pirog appears to be Ms. Detty's father. Mr. Pirog was a counterplaintiff in the counterclaim against Mr. Mavronis. A Stipulation of Dismissal filed on July 13, 2023, dismissed all claims by Mr. Mavronis against Mr. Pirog, and all claims by Mr. Pirog against Mr. Mavronis.

Mr. Mavronis and his son Stephen, Mr. Donohue, Ms. Detty, three different surveyors,[3] a landscaper, a geotechnical engineer, and previous owners of the Snyder Avenue property. Mr. Mavronis purchased the Jarsey lot in 1979 and conducted various activities there, including building the bulkhead and dock, burying a drainage pipe between the street and Haddaway Creek, and cultivating a variety of plants. The Snyder Avenue lot was owned in 1979 by Dan Miller and sold at some point to Frank Lycett. Frank Lycett's son Dean and his wife acquired the property from Mr. Lycett and resided there until 1997, when they sold the property to the Hamptons; in 2020 Mr. Donohue purchased the property to let to the Dettys.

Mr. Mavronis testified that he installed the bulkhead which establishes the southern-eastern boundary of the toe and filled in the area behind it in 1987. Prior to the installation of the bulkhead, the area consisted of marshlands. Fill had been placed in the marshlands. The Mavronises and the United States Government (the "Government") executed an Agreed Order, dated July 26, 1985, entered by the United States District Court for the District of Maryland. Under the terms of the Agreed Order the Mavronises agreed to remove the fill and grade the marshlands in accordance with specifications of the United States Army Corps of Engineers (the "Corps"). On November 26, 1985, the Government advised the Court that the Mavronises had complied with the Agreed Order.

---

[3] The surveyors all provided surveys which were admitted as evidence; the original copies of those surveys were destroyed by the Clerk of the Circuit Court for Baltimore County pursuant to Md. Rule 16-405 despite the pendency of the appeal and are unavailable for our review.

4

In 1987, the Mavronises proposed to build a pier and a bulkhead. The Corps stated that beyond building the bulkhead landward of the marsh, it did not have jurisdiction to approve it. It advised Mr. Mavronis to get any necessary State and local approvals. On June 4, 1987, Baltimore County issued a permit for the construction of a 60 foot pier, with a 10 foot by 20 foot "T" and four mooring piles. On June 9, 1987, Baltimore County approved of the construction of a 36 foot 3 inch long bulkhead to "be placed at the toe of the bank of and landward of all marsh vegetation" as staked by the Corps. The record does not include any other permits for the pier or bulkhead.

Mr. Mavronis's son Stephen was around 26 or 27 years old when the pier and the bulkhead were completed. He testified that the county and the Corps were heavily involved with the project because "there was a dredging project coming right behind our project," and that the latter established the grading for the fast land behind the bulkhead. He said that no neighbors objected to the building of the bulkhead at the time; that, in fact, the owners of the Snyder Avenue property at that time also applied for permits to build a pier and built it; and that the Mavronis's pier did not interfere with the Hamptons' access to navigable waters, even when they had a large sailboat. Stephen Mavronis also described a gulch between the two properties where water would run into Haddaway Creek and how he, his father, and his brother had installed a pipe underground to divert the surface water, which alleviated, but did not eliminate, the problem.

The bulkhead was damaged in September 2003 by Hurricane Isabel; it became detached and required significant repair for which permits were necessary and were granted. This repair process resulted in a lawsuit with the then-owners of the Snyder

5

Avenue property, Charlie and Margot Hampton. Mr. Mavronis said that the Hamptons alleged that repair and refill of the bulkhead area encroached on their land but averred that the work he did was within the bounds of the permits he had secured from the local and federal government. The case settled, and the settlement was placed on record in 2009. That agreement reads:

> The parties agree that the Hamptons will dismiss their lawsuit. They further agree that the Mavronis[es] own and are responsible to maintain the drainage pipe. And if in the future any excavation is required, [the] Mavronis[es] agree that they will restore the area to its pre-repair condition at [their] expense.

> The parties agree that the Mavronis dock is affixed to the Mavronis land, and that the bulkhead and pier are owned by the Mavronis[es] and are to be maintained by them in same status as currently exists.

> The Defendants deny any liability.

> The case will be dismissed with prejudice. The parties agree to split the open court costs, and the Standard Fire Insurance Company will pay to the Hamptons the sum of $14,000.00 for expenses.

Mr. Mavronis thought that the dispute with the Hamptons was resolved until, in 2009, after the settlement, the Hamptons placed a black fence "right down the place that I [Mr. Mavronis] was allowed by the Corp of Engineers [sic] and by the County to install [fill]," beyond where he had thought the boundary line was based on an earlier survey and his interactions with previous owners of the Snyder Avenue property.

The Mavronises have kept a garden in parts of the disputed area. Mr. Mavronis stated that the garden has been maintained, and slightly expanded, in its current form since around 2015, but that he and his son had been planting shrubbery and trees, cutting the grass, and generally maintaining the property line since they moved there. He described

6

how over time, the garden developed into a "raised" garden with segregated beds for various plants, and stated that he began planting Crepe Myrtles and Roses of Sharon around 2010, and maintained the land in accordance with a survey conducted at the time he purchased the land in 1979, which was established by a line of six pine trees planted by Dan Miller, who then owned the Snyder Avenue lot.

Stephen Mavronis testified that in October of 2021, his new neighbors cut down the shrubbery, bushes, and plants he and his family had maintained for years:

> They had saws, circular saw. They were out there cutting through what is a critter fence that I had up around certain parts of the garden to keep the groundhogs out, and they were cutting through the wood, they were cutting the trees, they were cutting the bushes, and I heard the noises from the fence posts sound like it was hitting something that was in the ground.

He thought that "something" in the ground was the drainpipe. He said his garden, which he depended on not only to eat healthy, but for his profession and to give food to neighbors, was damaged, which included the garden boxes, electrical lighting, irrigation, and plantings, as well as expensive organic soil. He stated that Greece no longer permitted the export of certain flora, including fig trees, Wisteria vines, grape vines, Crepe Myrtles, and Rose of Sharon, which made their replacement impossible. Stephen Mavronis said that the raised beds were a work in progress that had begun around 2014 or 2015. He used pea gravel with underdrain between the boxes, which were lined with grower fabric to segregate material from leaking outside of the planter bags, and were reinforced with impervious material, which solidified the wood to which the grower fabric was attached. The system was designed to encourage proper drainage and to ensure that the soil would not make its way into the water table in the event the planter bags ever broke. The planters

7

were located within 6 to 10 inches of the Hampton fence. Even before the planters were installed, Stephen Mavronis asserted, the Mavronises maintained pine trees, grape vines, Wisteria vines, and Crepe Myrtles, as well as vegetables like tomatoes, corn, and peppers.

Mr. Mavronis called a landscaper, Mr. John Akehurst of Akehurst Landscape Services, Inc., to testify to the value of the plant material and garden structure, and a geotechnical engineer, Mr. Kevin Tehansky of Foundation Test Group, to opine on the damage to the drainpipe. Mr. Akehurst had reviewed photographs of the gardens from before the Dettys interfered with them and inspected the gardens. He observed that they were aesthetically appealing and created a "nice backdrop to the property," found the property to be "well maintained and manicured" and without any plant infestations, and noted that the raised garden beds which had been constructed of timber and segregated by pea gravel were destroyed, the soil "kind of eroded or washed out because of the damage." He commented on the quality of the soil mix, which was purchased from a firm in Harford County, contained good nutrients, and was designed with soil aeration in mind. Mr. Donohue elicited that the Crepe Myrtles appeared to be around seven or eight years old, based on their height, rather than the 15 or 20 years of age that Mr. Mavronis proffered. Mr. Tehansky, the engineer, testified that the cost of repairing the damage to the drainpipe, considering labor, materials, excavation and backfill, could be $330 per linear foot or around $40,000 in total, although he could not be sure the damage was entirely caused by the Dettys' installation of the fence.

Ms. Hampton testified. She said she understood the property line to lie along the pine trees, which were no longer there. She attributed the dispute between her and her

8

husband and Mr. Mavronis after Hurricane Isabel to what she thought was Mr. Mavronis's wife's irritation at her water view being blocked by the Hamptons' new shed and to an "addition" that Mr. Mavronis built which Ms. Hampton believed crossed the property line. She testified briefly to installing the black fence to mark the property line. She confirmed that the Mavronises had always gardened on the edge of their property, though she stated that it was not until later that the gardens became raised beds.

Ms. Detty testified. She described erecting a chain link fence across her property. She said the fence was six to eight inches on her side of the property line pursuant to the survey conducted by David Green. She said that "both Mr. Mavronises" would often come into the yard at night or while her family was on vacation and cut the grass, or move her lawn furniture and put theirs in. She caught them on video camera.

### Testimony of the Surveyors

Michael Edwards was called by Mr. Mavronis and established as an expert in land and boundary survey. The survey he conducted in 2008 of the limits of the Mavronis property, 2535 Jarsey Avenue, during the dispute between Mr. Mavronis and the Hamptons, was admitted. He stated that the Mavronis property consists of three lots, numbers 69, 70, and 71, which were outlined on the plat of Krakow,[4] which divided up the property in the early twentieth century. He explained that he ran a "closed traverse loop" around the property based on the original monuments, which included some pipe, a stone, and a gum tree, among other things, though he was not able to find all of the markers

---

[4] "Plat of Krakow, Baltimore County, Maryland," dated August 17, 1917, prepared by Edward V. Cannon & Co. This plat is the subdivision plat for the neighborhood.

indicated by the original deed. He located the drainage pipe which runs from Jarsey Avenue to Haddaway Creek and recorded it on the survey as crossing over the boundary line. He stated that some trees were "right on" the property line, or "pretty darn close." Regarding the stones he found, they could not have moved, Mr. Edwards said, because they were "two feet in the ground," and he was sure they were placed there intentionally, but they were muddy, and Mr. Edwards could not identify whether they had markers on them. When asked whether "the purpose of generating this survey was for the benefit of Mr. Mavronis," Mr. Edwards responded, "No, it was for the benefit of doing the right survey." When he had visited the property, he did not notice any flower beds, but he did recall seeing a black fence, which he described as "meandering," going "this way and . . . along the property line." His survey contained the largest allotment of land to Mr. Mavronis of the surveys submitted during the trial. Per his survey, the angle between the first and second stretches was wider than the other survey, with the result that the drainpipe installed by Mr. Mavronis lay almost entirely on his own land, and the third leg extended parallel to Mr. Mavronis's eastern boundary, rendering the entire toe property of Mavronis. He did indicate that portions of the land which Mr. Mavronis rehabilitated, identified in the Corps documents pertaining to the 1980s work and the work in the wake of Hurricane Isabel, appeared to belong to the Hamptons.

Joel Leininger provided a second survey and testified for Mr. Mavronis as an expert, pursuant to his extensive resume: after graduating from the Department of Defense's Defense Mapping School, he worked as a land surveyor for over 40 years, during which time he provided expert testimony in plan surveying some 20 to 25 times, maintained

membership in the Maryland Society of Surveyors, of which he was President, Standards Committee Chairman, and Baltimore Chapter Chairman, as well as Surveyor of the Year, and published a book on boundary retracement in surveying. To conduct his survey he had reviewed the history of the plot, including the documents associated with the Corps, the permitting process, and the construction of the bulkhead and pier, as well as the title of the Upland area, including the plat of Krakow and various deeds dating back to 1910. Mr. Leininger stated that the filled area "was once part of the creek bed," so "there's a different set of doctrines that come into play to figure out who owns it and how they came to own it." He opined on the ownership of the filled property:

> [T]he origin of that property was different than the Upland area. In other words, it was what we call navigable water. Navigable water in Maryland is water that is subject to the ebbs and flow of the tides. Most of the time— there are a couple exceptions—but most of the time the title of that area is vested in the State. The State being the successor to the Calverts who got it from King George.

> In 1862 rules were enacted that said that when a riparian owner improves in front of his land, after the improvements were completed, the title to those improvements vested in him. That was modified significantly in 1970, but there were certain elements that were left intact. It turns out that the jurisdiction of the apportionment of those riparian rights—in other words, where I can build my pier as opposed to where my neighbor could build his pier—is usually delegated to the counties, and the counties exercise control in the permit process about where one could build piers. The same thing with building bulkheads.

> In this case, Mr. Mavronis went to the county, got valid permits, and did his construction. Based on that and the fact that it's completed it falls under a couple of exceptions in those 1970 rule recodifications, if you will, and it was our opinion that the title vested in him as a result. So, thus, we drew our boundaries wrapping about those new improvements, new in quotation marks.

11

The Court clarified: "More or less because Mr. Mavronis applied for the permits for the bulkhead and the fill when they were granted by Baltimore County, what he did becomes his property." Mr. Leininger confirmed and explained that he drew the line by extending the deed boundary to the end of the bulkhead, which would represent the area that Mr. Mavronis had filled pursuant to the permits he had obtained, which was not already claimed by another party.

David Green was hired by Mr. Donohue and the Dettys to conduct a survey of the boundaries of the Snyder Avenue property, particularly focused on the eastern property line. He described the process of taking the survey: his crew ran a traverse around the property, and looked for and found several markers; on their second go around, they found different markers which they held for the purposes of the survey. His team also checked the adjoining property by recreating the plat of Krakow to ensure that Mr. Mavronis had the correct amount of property and discovered that Mr. Mavronis had more than he should. He stated that he found some markers whose significance he could not identify, but which may have been based on "an older boundary before the bulkhead was moved out into the water." Mr. Green did not believe that the survey conducted by Mr. Edwards could be entirely verified because he had not compared the property lines to the plats, though he agreed that it generally aligned with his. As to Mr. Leininger's survey, he considered it "pure fantasy" to base a survey on a plat for a pier permit, because he had had problems with those plats in the past. He alleged that "the person who preps them is generally speaking for the person who built the pier," and has "no understanding of boundary lines," and a "cozy relationship with the County." Mr. Green stated that a "permit cannot grant

12

property interest at all, especially if it's based on fallacious information," and called the permit for the Mavronis pier "absolute rubbish." He explained that since the Snyder Avenue deed called for the waters of the Haddaway Creek, the deed includes the land under the water, including navigable water. He stated that he did not review any permits issued by Baltimore County to Mr. Mavronis for the fill because "it wouldn't have effected [*sic*] [his] survey." He noted that because the plat of Krakow contained no bearings on its lines, it would be difficult to reestablish them, which could create "some discrepancy on that line between the surveyors without any of them being negligent."

Mr. Mavronis called Mr. Leininger to rebut the testimony of Mr. Green. Mr. Leininger contended that the Green survey contained several deficiencies, causing it not to meet the minimum standards codified in the Code of Maryland Regulations, including the omission both of certain mathematical relationships and the specific meridian relied on, which inform future surveyors as to the methods used in a particular survey and ensure continuity between different surveyors. Mr. Leininger stated that due to these omissions he could not determine the accuracy of Mr. Green's survey. Mr. Leininger also disputed Mr. Green's assessment of "the genealogy" of the governing documents. He described how the oldest conveyances must always govern, and that different documents, e.g., the original plat, various deeds, subsequent divisions, control different property lines. He noted that all the surveyors basically agreed that none of the objects identified by the oldest and controlling deed from 1912 survive, meaning that the next most senior document governed—the plat of Krakow—which he observed had indications that its surveyor "did not have a firm belief about where those lines were at the time."

13

*Declaratory Judgment and Jury Verdict*

The court found Mr. Leininger's survey, and the rationale behind it, most convincing and declared the Leininger plat to contain the governing boundary between the properties. The jury rendered a verdict in favor of Mr. Mavronis on the trespass count against the Dettys and awarded Mr. Mavronis $27,500 in damages. In its opinion, the court wrote that it found all three surveyors to be "highly competent and thoroughly familiar with the property at issue" though they used "different methods to arrive at their surveys." It noted that the "property line is almost the same in all three surveys" with the largest deviation being three feet. It found Mr. Mavronis did not adversely possess the land along the property line, that the disputed triangle "was established in the late 1980's when Mr. Mavronis had a bulkhead built (the 36' portion of the triangle) and backfilled the remainder to create the small triangle of land." It noted the grant of a permit by Baltimore County, and commented that the triangle was "maintained by Mavronis since its installation and was not noted in any way in the settlement of the Hampton-Mavronis case." It rejected Donohue's argument that the triangle was his property, writing:

> To accept this argument would mean that the triangle that was created with the approval of the United States, and permitted by Baltimore County over thirty years prior to Donohue taking title, would be part of his lot. No deed was admitted showing any right of title to the questioned triangle. No survey was admitting into evidence showing the property at issue as being owned by Donohue. Mr. Mavronis obtained approval from Baltimore County and the United States and then paid for the construction of the bulkhead and fill. This would be an odd expense for someone to undertake on land to which they had no right.

It accepted Mr. Mavronis's argument that the land, pursuant to § 16-201 of the Environmental Article of the Maryland Annotated Code, which entitles a person to "make

improvement into the water in front of the land to preserve that person's access to the navigable water," and that "improvement is the property of the owner of the land to which the improvement is attached," belonged to Mr. Mavronis because he constructed improvements, with permit, into the water which were attached to his property. The court noted briefly that adverse possession did apply to the triangle, writing, "[i]f the property at issue had been owned by the predecessor in title to Mr. Donohue in 1987 when the triangle at issue was established, adverse possession would apply. Mr. Mavronis satisfied all five elements. No facts were elicited at trial that the area in question was ever controlled by anyone except Mr. Mavronis."

The Dettys and Mr. Donohue timely filed a motion for judgment notwithstanding the verdict and a motion for new trial, contending that the jury's award of $27,500 to Mr. Mavronis should be set aside or remitted. The court denied these motions. The Dettys and Mr. Donohue noted timely appeals, and Mr. Mavronis filed a cross appeal.

## QUESTIONS PRESENTED

Of the following three questions, the Appellants present the first two and the Appellee presents the third, for our consideration:

1. Did the trial court err in its finding that the disputed area was property of Mavronis?

2. Did the trial court err in declining to set aside an award of $27,500.00 in damages to Mr. Mavronis?

3. Did the trial court err when it did not find, based on either adverse possession or the survey of Appellee's expert Michael Edwards, that the tree line between the Mavronis and Snyder properties constitutes the actual property line north of the toe?

15

We answer all three questions in the negative and affirm the ruling of the trial court.

**STANDARD OF REVIEW**

We review "a trial court's denial of a motion for a new trial using an abuse of discretion standard." *Mason v. Lynch*, 151 Md. App. 17, 28 (2003) (citing *Butkiewicz v. State*, 127 Md. App. 412, 421 (1999)). In this context, "the emphasis has consistently been upon granting the broadest range of discretion to trial judges whenever the decision has necessarily depended upon the judge's evaluation of the testimony and of the trial." *Mason*, 151 Md. App. at 28. The "determination of a boundary line . . . is a fact-intensive query based on testimony and/or demonstrative evidence" which lies well within the province of the trial court. *See Webb v. Nowak*, 433 Md. 666, 677 (2013).

"In general, the denial of a motion to alter or amend a judgment or for reconsideration is reviewed by [the] appellate courts for abuse of discretion," *Miller v. Mathias*, 428 Md. 419, 438 (2012) (quoting *RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 673 (2010)); likewise, "[w]e will not disturb a trial court's remittitur decision except in cases of an abuse of discretion." *Hebron Volunteer Fire Dept., Inc. v. Whitelock*, 166 Md. App. 619, 628 (2006) (quoting *Owens-Illinois, Inc. v. Hunter*, 162 Md. App. 385, 415 (2005), *cert. denied*, 388 Md. 674 (2005)). "[A] ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling." *Darcars Motors of Silver Spring, Inc. v. Borzym*, 150 Md. App. 18, 81 (2003), *aff'd*, 379 Md. 249 (2004) (citation omitted). Rather, reversal requires our concluding that the decision under review is "well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally

16

acceptable." *Id.* (citation omitted). Yet, a "court's discretion is always tempered by the requirement that the court correctly apply the law applicable to the case." *Rose v. Rose*, 236 Md. App. 117, 129 (2018) (quoting *Arrington v. State*, 411 Md. 524, 552 (2009)).

## ANALYSIS

### *Disputed Triangle*

Mr. Donohue and the Dettys allege four errors in the court's finding that the disputed "toe" was the property of Mavronis: that the court erred in relying on the doctrine of accretion; that it should have extended the property line into Haddaway Creek; that it applied adverse possession improperly; and that it should have ruled Mr. Mavronis was estopped from asserting a claim to the disputed area.

### 1. Accretion

The title to "all navigable waters and to the soil below the mean high-water mark of those waters is vested in the State as successor to the Lord Proprietary who had received it by the crown," and in "the absence of specific statutory authority to the contrary, therefore, the right to extend permanent improvements into the waters in front of one's land is not an inherent or common law right." *Wicks v. Howard*, 40 Md. App. 135, 136 (1978). Rather:

> The right to extend improvements such as wharves and piers into the water is a statutory one, granted by the State as successor to the Lord Proprietary to enhance the right of riparian access to the waters. The original grant of the right to make and hold title to improvements in the waters in front of one's land gave title of such improvements, not necessarily to the landowner by virtue of his ownership, but rather to the "improvers, their heirs and assigns forever", as "an encouragement for such improvers". Ch. 9, Acts of 1745 (repealed 1960). *Balt. Ohio. R. R. Co. v. Chase*, 42 Md. 23, 32-33 [(1875)].

*Id.* The General Assembly encoded these rights in 1862, and "[s]imilar principles of right to improve and ownership were carried over in the Wetlands Act of 1970," *id.* at 137, which has been partially amended since 1970, but relevant portions remain substantially the same. That statute, now codified at § 16-201(a) of the Environment Article of the Maryland Annotated Code, provides in part:

> A person who is the owner of land bounding on navigable water is entitled to any natural accretion to the person's land, to reclaim fast land lost to erosion or avulsion during the person's ownership of the land to the extent of provable existing boundaries. The person may make improvement into the water in front of the land to preserve that person's access to the navigable water or, subject to subsection (c), to protect the shore of that person against erosion. After an improvement has been constructed, the improvement is the property of the owner of the land to which the improvement is attached. . . .

The trial court applied this rule in the instant matter and found that although the triangle was not created by natural accretion or to reclaim fast land, it was made to preserve access to navigable waters and to protect the shoreline from erosion; as such, it being attached to Mr. Mavronis's property, it became his property once it was completed.

Mr. Donohue argues that § 16-201 entitles riparian proprietors only to natural accretion and requires Mr. Mavronis to show that any fill was done to reclaim land lost to erosion or avulsion. He contends since Mr. Mavronis cannot do this, the court cannot conclude that the doctrine of accretion applies.

In *Wicks v. Howard*, we explained that § 16-201(a) was "simply a legislative attempt to guarantee each riparian owner his well established common law right of access to navigable waters by granting to him the exclusive privilege of making improvements in State-owned waters abutting his property." 40 Md. App. at 140. We observed:

18

> It need hardly be noted that the geographic variables preclude complete equality of access on a formula basis. . . . There is no rigid method of apportioning the statutory riparian rights to construct improvements, the governing principle being merely that the division must be equitable, not necessarily equal. *See* Anno., Riparian Owners Boundaries, 65 A.L.R.2d 143, 153, *et seq.*, and cases cited therein.

*Id.* The basic rationale behind the General Assembly's provision to riparian owners the "rights to land surfacing under by accretion or reliction" under § 16-201, even its "sole purpose," was "to assure the riparian owner that he would never be cut off from his access to water." *Board of Public Works v. Larmar Corp.*, 262 Md. 24, 36 (1971). The clause of the first sentence of § 16-201(a) entitles a waterfront proprietor to natural accretion. The clause of this sentence, however, does not act as a limitation on the second sentence. The remainder of the first sentence affords a proprietor the right to preserve their access to the water. We interpret the second clause as expanding the rights granted in the first. This right to preserve access to water is not unlimited; it is granted in light of the environmental concerns attendant to the Wetlands Act and its various amendments, and its exercise may require proper permitting and license from a number of different local, state, and federal organizations. *See, e.g., Larmar Corp.*, 262 Md. at 53–54. In particular, the Environment Article delegates to the Department of the Environment authority to develop provisions that recognize the authority of the "local jurisdiction" over the "construction of piers and bulkheads landward of the boundary lines of State and private wetlands. . . ." § 16-105(b). It was well supported by the evidence that in this case the local jurisdiction approved the bulkhead and fill when they were originally constructed, and again when they needed repair after Hurricane Isabel. It was also established by the settlement that the bulkhead was the

19

property of Mr. Mavronis and "affixed to the Mavronis Land." The court adopted Mr. Leininger's survey, reasoning that Mr. Leininger had taken into account this doctrine of the riparian owner's ownership of completed waterfront improvements, and we find no error in its doing so.

### 2. Extension of Boundary Lines into Haddaway Creek

Mr. Donohue and the Dettys argue that the lower court should have drawn the boundary between the two properties pursuant to the § 417.3 of the Baltimore County Code, which provides:

> For the purpose of defining boundaries within which waterfront construction may take place, divisional lines shall be established in accordance with the following rules:
>
> A.) With straight shorelines. If the shoreline is straight, the divisional lines are to be extended from the intersection of the property line and the shoreline into the water perpendicular to the shoreline, or where the property lines are parallel and it is practical to do so, the property boundary line shall be extended in a straight line into the water.
>
> B.) With irregular shorelines. Where the shoreline is not straight, draw baseline between the two corners of each lot at mean low water line. Then draw a line from the corner of each proprietor's property into the water at right angles with the baseline. If by reason of the curvature of the shore, the lines, when projected into the water, diverge from each other, the area excluded by both lines shall be equally divided between the two adjoining proprietors. If by reason of the curvature of the shore, the lines, when projected into the water, converge with each other, the area included by both lines shall be equally divided between the two adjoining proprietors.

Mr. Donohue and the Dettys suggest that the survey of David Green was conducted pursuant to this rule.

We cannot see that this rule applies to the instant matter. The rule applies when "defining boundaries within which waterfront construction may take place," and in this case, the waterfront construction has taken place, the ownership of the improvements has been conclusively determined per previous settlement, and what is in dispute is not where construction may take place, but is rather the ownership of now-existing land which is not included in any particular deed, and which may or may not have been created in compliance with local, state, and federal authority almost forty years ago. Further, the boundaries in Mr. Green's survey cannot be understood to comport with this rule. The rule prescribes that when dealing with irregular shorelines, baselines should first be drawn between the waterfront corners of each property, and then provisional lines be extended at right angles from the properties' abutting corners. Depending on whether the angle created between the two baselines is obtuse or acute, the area between the two extension lines, which may either be included or excluded by the provisional lines, is split between the two proprietors, resulting in a boundary that cannot be parallel to the existing line between the parties. Given that § 417.3 of the Baltimore County Code is not applicable to the instant matter, the court did not err foregoing its application.

Regarding Mr. Green's approach to riparian apportionment, Mr. Green testified that he derived this boundary by extrapolating the boundary line into the water, and that title to the land under the waters of the Haddaway Creek was vested in Mr. Donohue according to his deed. On the contrary: "Title to the under water land is in the State, and remains there until improvements are lawfully made. Thus, the lines called for in a property owner's individual deed cannot control if in derogation of the riparian rights common to a group of

21

property owners[.]" *Mutual Chemical Co. of America v. Mayor and City Council of Baltimore*, 33 F. Supp. 881, 889 (D. Md. 1940). Courts apportioning riparian rights in Maryland have commented that "it is self-evident that each of these rules cannot be strictly applied where irregular shore lines are involved, if all affected property owners are to be treated equitably." *Id.* at 887 (citations omitted). The boundaries delimiting the Jarsey Avenue property extended ultimately converge to a point, meaning that there is the possibility that continuous gradual accretion and expansion of fast land may whittle the waterfront property line of Mr. Mavronis to nothing. The bulkhead serves to establish a property line which will preserve the small access of Mr. Mavronis to the water, while having a minute impact on the Snyder Avenue property, which the evidence demonstrates features extensive shoreline and a pier of its own. The principles of equity weigh in favor of preserving Mr. Mavronis's access to the water, and no common law or statute compels apportionment of riparian rights be achieved by extending the existing boundaries straight into the water. Thus, the court did not err in not doing so.

### 3. Adverse possession

Mr. Donohue and the Dettys argue that the circuit court's alternative reliance on the doctrine of adverse possession was in error. Our determination that the court's judgment is sound on other grounds obviates the need to address this issue.

### 4. Estoppel

Mr. Donohue and the Dettys assert that the trial court erred in determining that Mr. Mavronis was not estopped from asserting his claim to the disputed area by issue preclusion or claim preclusion due to the prior litigation between Mr. Mavronis and the Hamptons.

Mr. Mavronis argues that because the litigation between him and the Hamptons was resolved by a settlement which was placed on the record, the resolution does not qualify as a final judgment for the purposes of res judicata.

Res judicata bars relitigation; it "avoids the expense and vexation attending multiple lawsuits, conserves the judicial resources, and fosters reliance on judicial action by minimizing the possibilities of inconsistent decisions." *Anne Arundel Cnty. Bd. of Educ. v. Norville*, 390 Md. 93, 107 (2005) (quoting *Murray Int'l Freight Corp. v. Graham*, 315 Md. 543, 547 (1989)). We stated:

> Under Maryland law, the **requirements of *res judicata* or claim preclusion are: 1) that the parties in the present litigation are the same or in privity with the parties to the earlier dispute; 2) that the claim presented in the current action is identical to the one determined in the prior adjudication; and 3) that there was a final judgment on the merits.** Therefore, a judgment between the same parties and their privies is a final bar to any other suit upon the same cause of action and is conclusive, not only as to all matters decided in the original suit, *but also as to matters that could have been litigated in the original suit. To avoid the vagaries of res judicata's preclusive effect, a party must assert all the legal theories [that person] wishes to assert in [their] initial action, because failure to do so does not deprive the ensuing judgment of its effect as res judicata.*

*North American Specialty Ins. Co. v. Boston Med. Gr.*, 170 Md. App. 128, 137 (2006) (quoting *Colandrea v. Wilde Lake Community Assoc., Inc.*, 361 Md. 371, 392 (2000)). In other words, res judicata applies "not only to the points upon which the court was required by the parties to form an opinion, and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time." *Norville*, 390 Md. at 107 (quoting *Cromwell v. County of Sac*, 94 U.S. 351, 358 (1876)). "Once a set of facts has been

litigated, res judicata generally prevents the application of a different legal theory to that same set of facts, assuming that 'the second theory of liability existed when the first action was litigated.'" *Id.* at 111 (quoting *Gertz v. Anne Arundel Cnty.*, 339 Md. 261, 270 (1995)).

The test we apply for determining whether two causes of action are the same for the purposes of res judicata is "whether the same evidentiary facts would sustain both actions." *MPC, Inc. v. Kenny*, 279 Md. 29, 33 (1977). We have adopted the transactional approach:

(1) When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar (see §§ 18, 19), the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connection transactions, out of which the action arose.

(2) What factual group constitutes a "transaction", and what groupings constitute a "series", are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

*Gonsalves v. Bingel*, 194 Md. App. 695, 710 (2010) (quoting Restatement (Second) of Judgments § 24 (1982)).

In a comparison of the instant request for declaratory judgment to the Hampton-Mavronis litigation, the first and third elements of res judicata are clearly satisfied. The instant suit is between Mr. Mavronis, who was a party to the former suit, and Mr. Donohue, who purchased the property at issue from the Hamptons and is thus in privity with them. The previous lawsuit ended in a settlement which was placed on the record and included a dismissal of the case with prejudice, which is a qualifying final judgment on the merits. *See, e.g., Bryan v. State Farm Mut. Auto Ins. Co.*, 205 Md. App. 587, 603 (2012) ("Under

24

Maryland law, a docket entry recording a voluntary dismissal with prejudice . . . constitutes a judgment which operates, at a minimum, as a bar to a further action on the same claim.").

However, the requirement that the cause of action is identical or could have been brought in the first instance is not satisfied. Under the "same evidence" test, substantial events have occurred since the initial cause of action was brought by the Hamptons against Mr. Mavronis, which render the dispute as to the ownership of the disputed area, purportedly settled as to the instant matter, in a new light. The complaint in the Hamptons' suit consisted of three counts: negligence, nuisance, and trespass. The complaint alleged excavations that the Mavronises had done on the Hampton property. The complaint also alleged that the Mavronises' dock encroached on the Hampton property. The settlement agreement specifically addressed the Mavronises' responsibilities regarding the drainage pipe. It also recognized that the dock and the bulkhead are affixed to the Mavronis land and belong to the Mavronises. Although not specifically in the agreement, counsel for the Mavronises mentioned that the parties would be free to obtain surveys to resolve the property line issue. *See Hughes v. Insley*, 155 Md. App. 609, 627 (2003) (quoting Restatement (Second) of Judgments § 24, cmt. *f* (1982)) ("Material operative facts occurring after the decision of an action with respect to the same subject matter may in themselves, or taken in conjunction with the antecedent facts, comprise a transaction which may be made the basis of a second action not precluded by the first.").

In any event, Mr. Donohue and the Dettys in their counterclaim requested almost identical relief to that which they seek to preclude Mr. Mavronis from requesting. A determination barring Mr. Mavronis's request would compel like treatment of Mr.

25

Donohue's. Had the trial court refused to determine the boundary between the two properties, the parties would be left mired in untenable uncertainty regarding their property lines and the ownership of the disputed area. The court did not err in permitting Mr. Mavronis to assert a claim to the disputed area. The seminal issue in this case is the boundary line between the two parcels. If the parties were barred from litigating that issue because it was left unaddressed by the previous case, both parcels would have clouds on their title. In that regard, the trial court's adjudication of the boundary line between the parcels was not barred by the doctrine of issue preclusion.

## Jury Award

Mr. Donohue and the Dettys moved for a directed verdict regarding Mr. Mavronis's trespass claims after the court determined that it would adopt as the property line the boundary proposed by Mr. Leininger. They argued that, under that property line, it was clear that the garden of Mr. Mavronis encroached on their land, and that the chain link fence they constructed was situated entirely on their land, meaning that they did not trespass onto Mr. Mavronis's property in erecting the fence. They also contend that the removal of the garden was not a trespass but lawful self-help. They also assert that the trial judge should have set aside the verdict or granted a remittitur. Mr. Mavronis responds that the evidence shows that, although portions of the chain link fence were constructed on Mr. Donohue's property, it also cut through the disputed "toe." He argues that the court did not abuse its discretion in refusing to order a remittitur because the jury award was not "grossly excessive" nor is it one for which there is not even slight evidence.

26

A trial court which finds that a jury's verdict is "grossly excessive" or "shocks the conscience of the court" may provide for remittitur or order a new trial. *Cunningham v. Baltimore Cnty.*, 246 Md. App. 630, 703 (2020) (quoting *Conklin v. Schillinger*, 255 Md. 50, 64–66 (1969)) ("Historically, . . . the trial judge could threaten to order a new trial unless the plaintiff agreed to 'remit' that portion of the award that the judge deemed to be excessive."); *see also Hebron Volunteer Fire Dept., Inc.*, 166 Md. App. at 628 ("The standard to be applied by a trial judge in determining whether a new trial should be granted on the ground of excessiveness has been variously stated as whether the verdict is 'grossly excessive,' or 'shocks the conscience of the court,' or is 'inordinate' or 'outrageously excessive,' or even simply 'excessive.'") (citations omitted). It is generally accepted that the upper limit of a remittitur is the "highest amount any jury could properly award." *Hebron Voluntary Fire Dept., Inc.*, 166 Md. App. at 635–36 (collecting cases). Our Supreme Court observed that it found "no case where this Court has ever disturbed the exercise of the lower court's discretion in denying a motion for a new trial because of the inadequacy or excessiveness of damages." *Buck v. Cam's Broadloom Rugs, Inc.*, 328 Md. 51, 57–58 (1992) (quoting *Kirkpatrick v. Zimmerman*, 257 Md. 215, 218 (1970)).

In this case, as we have noted, the trial judge declared the boundary line outside of consideration by the jury. After adopting the boundary lines as reflected in Mr. Leininger's plat, the judge informed the jury of his decision and provided the jury with the plat for use during deliberation on the tort claims. During closing arguments, both Mr. Mavronis and the Appellants addressed the issue of the location of the fence with regard to the property line in terms of whether its construction constituted a trespass. Video and photo evidence

27

clearly show that the fence crossed the disputed area, which the court found to be the property of Mr. Mavronis. Mr. Mavronis requested damages not only for the vegetation and garden beds which were destroyed by the Dettys, valued at $27,360.28, but also for damage he alleged they caused to the underground drainage pipe, which he estimated cost $40,000. These numbers were drawn from the testimony of Mr. Akehurst and Mr. Tehansky respectively and sum to $67,360.28. There is more than "slight evidence" supporting the jury's verdict that a trespass occurred. The doctrine of remittitur is intended to address excessive damages when the award of damages exceeds the highest amount that the jury could have properly awarded. *Hebron Volunteer Fire Department, Inc.*, 166 Md. App. at 636. This amount is based on the evidence presented to the jury. *Id*. In this case, there was competent evidence to support the jury's finding that a trespass occurred, and the damages amounted to $27,360.28. The court was not required to grant a remittitur. In making that decision, the court applied the correct legal standard, and its application of that standard was in no way removed from the center mark which this court deems acceptable. As such, we affirm the court's ruling.

### Adoption of the Edwards' Survey

The difference between the Edwards survey and the Leininger survey in regard to the middle section of the property line is that the Edwards survey places the property line three feet west of the property line in the Leininger survey and thus affords Mr. Mavronis more land. Mr. Mavronis contends that the court erred in determining that he did not adversely possess that strip of land. Mr. Mavronis argues that he acquired the strip after a twenty-year period accrued which began shortly after the 1979 survey and ended sometime

later, based on the recognition of what Mr. Edwards marked as the boundary line by Dan Miller, the Lycetts, and the Hamptons. The court found that Mr. Mavronis did not adversely possess the land because the period between 2009, when the settlement occurred, and the initiation of the instant lawsuit did not satisfy the twenty-year requirement, and noted that photographic and other evidence did not clearly indicate that Mr. Mavronis and his family occupied the property all the way up to the Edwards line any time before the raised beds were installed.

To establish title by adverse possession, the claimant must show "possession of the claimed property for the statutory period of 20 years," which is "actual, open, notorious, exclusive, hostile, under claim of title or ownership, and continuous or uninterrupted." *Hillsmere Shores Improvement Ass'n, Inc. v. Singleton*, 182 Md. App. 667, 691 (2008) (citations omitted). We stated:

> "The burden of proving title by adverse possession is on the claimant." *Costello v. Staubitz*, 300 Md. 60, 67, 475 A.2d 1185 (1984)) . . . . The test is objective: "In evaluating a claim, the pertinent inquiry is whether the claimant has proved the elements 'based on the claimant's "objective manifestations" of adverse use, rather than on the claimant's subjective intent.'" *Porter* [*v. Schaffer*, 126 Md.[ ]App. 237, 276, 728 A.2d 755, *cert. denied*, 355 Md. 613, 735 A.2d 1107 (1999)] (quoting *Barchowsky v. Silver Farms, Inc.*, 105 Md.[ ]App. 228, 241, 659 A.2d 347, *cert. denied*, 340 Md. 301, 666 A.2d 1236 (1995)).

*Id.* at 692. It bears repeating that when we review an action tried without a jury, we "will not set aside the judgment of the lower court on the evidence unless clearly erroneous and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8-131(c).

29

Having reviewed the same evidence that the trial court did, in particular, overhead images taken over the last several decades, without the benefit of the trial court's ability to judge the credibility of the witnesses, we cannot find clear error in the court's determination that proof was not objectively sufficient to show the thin strip of land was continuously occupied by Mr. Mavronis for a twenty-year period between 1979 and 2009. We note that the court found a survey submitted by Mr. Mavronis to contain the most accurate determination of the boundary line. In presenting his case for his ownership of the disputed property, Mr. Mavronis submitted surveys by two different experts, both of which the court found credible, and in doing so ran the risk that the court would choose one survey over the other.

## CONCLUSION

The court did not err in declaring Mr. Mavronis the owner of the disputed property, in denying the motion for a new trial, or in adopting the survey conducted by Joel Leininger, rather than that of Michael Edwards, as the boundary between the two properties.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANTS.**